*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO APRIL 18, 2022

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


   * * * * * * * * * * * * * * * * * *
                                     *
   UNITED STATES OF AMERICA          *
                                     *  1:21-cr-41-05-JL
             v.                      *  July 23, 2021
                                     *  11:10 a.m.
   NOBODY                            *
                                     *
   * * * * * * * * * * * * * * * * * *



                 TRANSCRIPT OF MOTION HEARING
                  HELD VIA VIDEOCONFERENCE
             BEFORE THE HONORABLE JOSEPH N. LAPLANTE
```

Appearances:


For the Government:          Seth R. Aframe, AUSA
                             United States Attorney's Office




For the Defendant:           Patrick J. Richard, Esq.
                             Richard Law Office

                             Christopher Hayden Brown, Esq.
                             Brown, Suarez, Rios & Weinberg

                             Anessa Allen Santos, Esq.
                             IntelliLaw




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

2

```
                        I N D E X



Witness:              Direct    Cross    Redirect    Recross

Nobody
   By Mr. Brown         12
   By Mr. Aframe                  37



Exhibits:                        For ID              In Evd

None marked.
```

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  Good morning, your Honor.

 3              THE COURT:  Good morning, everybody.

 4              THE CLERK:  Court is now in session and has before

 5   it for consideration a motion hearing in criminal case

 6   20-cr-41-05-JL, United States vs. Nobody.

 7              THE COURT:  All right.  Let's observe some

 8   formalities.

 9              This is a -- this is an appeal -- I don't know if

10   you want to call it an appeal or a motion to reconsider Judge

11   Lynch's detention order in this case, which I reviewed and I

12   think I issued an order, a margin order, you know, on the

13   docket saying that I didn't see a basis to overturn that order

14   or to grant release under conditions, but I also didn't want to

15   be dismissive of the defendant's position because we're talking

16   about an important issue here, which is his liberty pretrial.

17   And so I just didn't want to be dismissive of it and not listen

18   to everything that he and his counsel wanted to tell me, so I

19   provided the opportunity for a -- a hearing so we can do that.

20   And that's what we'll do now.

21              I want to observe a few formalities.  We're convened

22   here on a videoconference platform as opposed to -- as opposed

23   to the usual physical appearance in a public courtroom.

24              Is there any objection to that, Mr. Richard?

25              MR. RICHARD:  No, your Honor.
```

4

1          THE COURT:  All right.  I want to make reference

2     then to a -- because normally a bail hearing or a detention

3     release hearing would be held in a courtroom because it's a --

4     it's a public proceeding.

5          This, by the way, is a public proceeding and it's

6     open to members of the public to participate by the

7     videoconference platform.

8          Hold on a second.

9          All right.  So I -- Mr. Nobody -- Mr. Nobody, you

10    had a comment there.

11         MR. RICHARD:  Your Honor, I'm going to let the Court

12    know that that is not the defendant posting that.  Clearly from

13    the bubbles other people with that name have posted something.

14    But that -- I'd ask whoever's involved, if they're here in

15    support of Mr. Nobody to actually remain silent verbally and

16    electronically during this proceeding to help.  Nothing that is

17    written will help Mr. Nobody and could only be used to hurt

18    him.  So please let the attorneys do the work here.

19         THE COURT:  I actually wouldn't have even raised

20    that.  I thought it was from the defendant.  I thought it

21    was -- you're telling me, Mr. Richard, that's not from your

22    client.

23         MR. RICHARD:  That's correct.  If you look in the

24    bubbles, there are other people named Nobody in the bubbles.

25    He is in the bubble named Merrimack County.

1          THE COURT:  I see.  Yup.  I see you, sir.  I saw you

2     wave.

3          THE DEFENDANT:  Okay.

4          THE COURT:  All right.  And, well, you -- you

5     certainly have my assurances that I'm not ever going to be

6     dismissive of any of your arguments or claims, but I understand

7     and I'm not -- I'm not concerned about it given that it wasn't

8     you.

9          I wasn't so much concerned about the comment as I

10    was about your client -- your attorney's control over the

11    situation.  I don't want to -- I don't want him to have to deal

12    with that extraneous information.

13         That's okay.  We'll proceed anyway.

14         I do want to observe some formalities that are

15    important, though.  I want to just get back to that so it's on

16    the record.

17         This is a public proceeding.  Under Rule 83.8,

18    anybody taking part in the proceedings remotely or by

19    videoconference shall not photograph, broadcast, or televise

20    any of these court proceedings.  The prohibition applies to

21    counsel, the parties, the media, and any members of the public

22    participating.

23         I'm happy to have all the members of the public

24    participating that want to be here.  It was publicly posted and

25    anybody who tries to gain access during the proceeding will be

1    allowed access.  We try to make this as close to a public

2    hearing in a public courtroom as we can under the

3    circumstances.

4              But transporting Mr. Nobody to and from the

5    detention facility would cause extra quarantining for him,

6    probably on both legs of the trip, and would expose him and

7    maybe expose others to unjustifiable health and safety risk at

8    this point.  Given his willingness to participate in this way,

9    we'll proceed in this way.

10             I do want to make reference to some administrative

11   orders that have been issued by the court in connection with

12   our court proceedings during the public health emergency caused

13   by the coronavirus pandemic.  Those are administrative orders

14   number -- the ones issued in the year 2020 were orders numbered

15   20-7 -11, -13, -25 through 27, and -34.  The ones issued in the

16   year 2021 were 21-10, -13, -14, -18, -19.  And I incorporate

17   all the findings and rulings of those other orders into the

18   record of this proceeding by reference.

19             I further find that delaying this proceeding longer

20   in order to allow for physical presence in a public courtroom

21   would be -- would be jeopardizing the interests of justice

22   because if there's going to be a release in this case, it

23   should happen sooner, not later, and I need to make sure I'm

24   listening to all the arguments that are being presented on

25   Mr. Nobody's behalf.

1          I do want to assure you, Mr. Nobody, of this.  You

2    know, I -- I -- comments that are made from the public, even if

3    you agree with them and they're from supporters, they're not

4    going to be held against you.  Those aren't issues you need to

5    worry yourself about at all.

6          THE DEFENDANT:  Thank you.

7          THE COURT:  Okay.  Mr. Richard, you saw my order.  I

8    didn't see anything in the written record that would change my

9    thinking from what Judge Lynch described in his detention

10   order, but that doesn't mean you might not be able to cast him

11   in a different light, so I'm listening.

12         MR. RICHARD:  Your Honor, Mr. Brown is actually

13   prepared to present something to the Court, so I'd defer to

14   him.

15         THE COURT:  Mr. Brown, welcome.  I'm sorry.  Please

16   proceed.

17         MR. BROWN:  No problem, your Honor.  We have a whole

18   team, so it can be confusing.

19         Good morning, sir.  Good to see you.  Happy Friday.

20         Your Honor, as a housekeeping matter, the first --

21   at the -- I won't call it the first detention hearing -- the

22   government played exhibits which are -- in the magistrate's

23   order are referenced, various comments that were made during a

24   16-minute phone call.  The entirety of that phone call was not

25   played at the first hearing.

1          I realize the Court has limited time, but I do want

2    to ask the Court to listen to the entire call because it gives

3    a context.  It's 16 minutes long.  And then I'm going to ask

4    Mr. Nobody about the remarks in the context in which -- of the

5    entire phone call.

6          So we're prepared, I believe, to play that with the

7    help of our courtroom deputy, Ms. Allen, to present that

8    exhibit.  It's listed as Government's Exhibit 6 on their

9    proposed exhibit list, document number 74.

10          So at this time, barring any technical difficulties,

11    or if the Court's okay with it, we'll play that now.

12          THE COURT:  I'm totally okay with it.  Do you -- you

13    shouldn't apologize for wasting my time or taking time.  This

14    is what we're doing here.  So you take the time you need,

15    Attorney Brown.

16          MR. BROWN:  I appreciate that.  Let's see if

17    Ms. Allen is able to get that queued up.

18          I believe you're on mute, Ms. Allen.

19          THE COURT:  She doesn't look muted, but I'm not

20    hearing her voice.

21          We cannot hear you.  Attorney Allen, we cannot hear

22    you.  Now you're on mute.  There you go.  Try it now.

23          MS. ALLEN SANTOS:  How about now?

24          THE COURT:  Much better.

25          MS. ALLEN SANTOS:  Okay.  Wonderful.  Thank you.

1    Changing speakers.  Let's give this a try.

2              Can everybody hear that?

3              MR. AFRAME:  (Shakes head.)

4              THE DEFENDANT:  No.

5              THE COURT:  No, I can't hear it.  Are you trying to

6    do a screen share or something like that?

7              MS. ALLEN SANTOS:  No.  All right.  That's right, I

8    need to screen share.  Thank you for that.

9              THE COURT:  Yeah.

10             MS. ALLEN SANTOS:  All right.  And click the share

11   sound button.  And here we go.

12             THE COURT:  There you go.

13                       (Audio recording played.)

14             MS. ALLEN SANTOS:  Now can everybody hear that?

15             THE COURT:  Yes.

16             MS. ALLEN SANTOS:  Perfect.  All right.  I will

17   continue.  Thank you for your patience.

18                       (Audio recording resumed.)

19             MS. ALLEN SANTOS:  If other people on this call

20   could mute their mics.  Thank you.

21             I'll continue playing where we left off, your Honor.

22             THE COURT:  Hold on, Attorney Allen.

23             Real quick.  Who was -- he just referred to his

24   counsel at his detention hearing.  Who represented him?

25             MR. AFRAME:  John Apruzzese.

```
1                    THE COURT:  Thank you, sir.

2                    Please proceed with the tape.

3                    MS. ALLEN SANTOS:  Yes, your Honor.

4                         (Audio recording resumed.)

5                    THE COURT:  Mr. Brown, you're on mute.

6                    MR. BROWN:  I apologize, your Honor.

7                    Thank you for listening to that, your Honor.  If I

8   may, at this time I'd like to call Mr. Nobody as a witness.

9                    THE COURT:  Please proceed.

10                   MR. BROWN:  Okay.

11                   THE COURT:  Well, we've got --

12                   THE CLERK:  Your Honor --

13                   THE COURT:  We're going to need to swear him in.

14                   MR. BROWN:  Yes.

15                   THE COURT:  I just want to make sure -- Mr. Nobody,

16  right?

17                   THE DEFENDANT:  Yes.

18                   THE COURT:  I want to make sure you understand you

19  don't have any obligation to -- it's your decision about

20  whether you testify or not in a proceeding like this.  You have

21  rights not to incriminate yourself in any way.  And I'm not

22  suggesting you're going to incriminate yourself at all, I just

23  want you to understand that you don't have to testify in a

24  hearing like this.  Do you understand that?

25                   THE DEFENDANT:  I do understand it.  Thank you for
```

1   making sure.

2              THE COURT:  All right.

3              And, Mr. Brown, have you been over with your client

4   his right -- his right against self-incrimination and that he's

5   basically waiving it when he testifies in a proceeding like

6   this?

7              MR. AFRAME:  Yes, sir, I have.  I've explained to

8   him that anything that's said here, obviously in the presence

9   of the Court and the government, can be used at further

10  proceedings, including trial, and also he subjects himself,

11  obviously, to cross-examination if he chooses to become a

12  witness within the scope of what we're discussing.  And he's

13  chosen to do that today.

14             THE COURT:  All right.

15             And, Mr. Nobody, that's true, what your attorney

16  just explained?  He's been over that with you?

17             THE DEFENDANT:  Yes, I do understand both -- both

18  issues.

19             THE COURT:  And it's your -- it's your free and

20  voluntary choice today to testify?

21             THE DEFENDANT:  It is.

22             THE COURT:  All right.  I'm not suggesting

23  anything's going to be used against you, but it could be, and

24  you just need to have your eyes open about that going into it.

25             THE DEFENDANT:  I'll try not to say anything stupid.

1              THE COURT:  All right.

2              THE DEFENDANT:  And just in advance, excuse my

3    language before.

4              THE COURT:  I'd be making similar apologies if I

5    were in your shoes, only because I have the same bad habits.

6    So don't worry about it.

7              Go ahead.

8              MR. BROWN:  If I may inquire, your Honor?

9              THE COURT:  You may.  Please proceed.

10                       DIRECT EXAMINATION

11   BY MR. BROWN:

12        Q.   All right.  First of all, I just -- if you don't

13   mind, I'll refer to you as Rich, because I know you as that and

14   I feel strange saying Mr. Nobody every time.

15              To give some context to this phone call, because

16   this appears to be the main issue based on the previous orders,

17   this call, first of all, would you agree that you were very

18   upset when you made that call?

19        A.   Oh, I was irate.

20        Q.   Now, I just heard you apologize to the Court for

21   some of your language.  Is it fair to say you're embarrassed at

22   some of the remarks that you made during the call --

23        A.   I'm a little red-faced listening to that phone call

24   in public.  Although I was aware it was being recorded, it

25   really wasn't -- it wasn't the way I would want to present

1    myself in public normally.  It was intended as a private phone

2    call between friends who understand each other and each other's

3    vagaries, even though I knew there were eavesdroppers.

4        Q.    Sure.  All right.  Let me just -- some general

5    background.  Let's talk a little bit about your philosophy.

6            Do you -- do you believe that anyone has the right

7    to use violence against another person outside of in

8    self-defense?

9        A.    No, I don't.  I don't believe in any initiation of

10   force, that's use of force except in self-defense.  You got it

11   right.

12       Q.    Have you ever advocated for initiation of violence

13   against -- against the U.S. Government at large or individuals

14   in the government like -- like witnesses in this case?

15       A.    No.  I mean, I've -- what I said in the court was --

16   or on the phone was, you know, cursing the police, but I was

17   not advocating for that.

18       Q.    You weren't trying to tell your friend, go out and

19   hurt law enforcement officers?

20       A.    Oh, God, no.  And he wouldn't -- he never would

21   anyway.

22       Q.    All right.  Have you -- not just during that phone

23   call but during the pendency of this case, have you threatened

24   or caused to be threatened any law enforcement officer or

25   civilian witness in this case?

1      A.    No.

2      Q.    Have you ever been convicted of any crime of

3  violence, sir?

4      A.    No.

5            MR. BROWN:  Now, the government is -- your Honor, I

6  believe the government's going to stipulate in their objection,

7  but I still want to ask my client about this.  There's a

8  reference made to a violation of probation hearing and a

9  finding of a state court judge that there was a -- a use,

10  possession, and brandishing of a dangerous weapon as a

11  violation.  I'm going to ask him about that real quick.

12      Q.    Although I think the government is stipulating that

13  both sides have actually gotten to view that hearing and, in

14  fact, Rich, you were not found guilty of brandishing the

15  dangerous weapon; is that correct?

16      A.    No.  The judge found that because I was under

17  physical attack that I acted properly in self-defense.

18      Q.    And he found the state hasn't established its burden

19  that you were a danger?

20      A.    That's correct.

21      Q.    And that was during a situation in which friends of

22  yours were being physically attacked and threatened in the

23  Keene town square?

24      A.    Yes.  We were attacked by a group of hoodlums and I

25  picked up a -- a metal piece of camera equipment and I stepped

1    between three attackers and a lady friend of mine.

2         Q.   But you didn't strike anyone with it?

3         A.   I did not strike anyone.  I just stood there and

4    looked mean.

5              THE COURT:  So from --

6         Q.   And the judge --

7              THE COURT:  Mr. Brown, so that was, what?  That was

8    over in the Keene District Court?

9              MR. BROWN:  Yes, your Honor.

10             THE COURT:  Who was the judge?

11             MR. BROWN:  I think my client will remember.

12             THE DEFENDANT:  It was -- I believe his last name

13   was Cleveland.

14             THE COURT:  Okay.  Thank you.

15             MR. BROWN:  And, again, I don't believe the

16   government's disputing this.  When that allegation was made in

17   their objections, neither side had access to it, but it turns

18   out there was actually a video recording of the proceedings.

19   We both watched it and that was, in fact, the finding of the

20   court.

21             THE COURT:  So if I understand your -- what you're

22   establishing correctly, Mr. Brown, basically you've told me

23   that the Court found him not dangerous or dangerous, but also

24   did find that his brandishing of a weapon was appropriate under

25   the circumstances?  Is that --

 1           MR. BROWN:  Yes, your Honor.  Yes, that's exactly

 2   what the Court found.  The Court did find him -- to be clear,

 3   and I don't want to obfuscate anything.  The Court still

 4   revoked his probation for use of marijuana and for failing to

 5   do a substance abuse treatment program which he freely

 6   admitted, but the Court found he did not use a weapon in a

 7   dangerous manner.

 8           I think the Court's actual terminology was I find

 9   the manner in which he brandished it was a defensive manner.  I

10   think that was the -- a direct quote of the district court

11   judge.

12           THE COURT:  And that was roughly when?  You know,

13   what year are we talking about?

14           THE DEFENDANT:  2015, '16.

15           THE COURT:  Thank you.  All right.

16      Q.   Now, I want to get into the context of this actual

17   call.  All right?  Now, first, you've already admitted you were

18   upset and you're embarrassed of your tone and some of the

19   things you said.

20           Now, you've had plenty of time to reflect on that,

21   but at the time you made the call, you'd been in jail for what,

22   a year or two, something like that?

23      A.   I -- I kind of lost track of time.  It was between

24   one and two weeks, probably a week and a half.

25      Q.   And at that point in time, you didn't have a lot of

1   information in terms of -- you didn't have discovery, right?

2      A.   No.  I had had ten minutes of discussion with my

3   attorney the day that I was arrested.  He had talked me into --

4   into waiving a bond hearing and then he disappeared and

5   wouldn't take my calls.

6      Q.   All right.  So you didn't have discovery, you knew

7   that there was a charge, one of your charges in your

8   indictment, maxxed out at 20 years.  Was it your belief at that

9   time that the government was seeking and you may actually be

10  getting 20 years in prison?

11     A.   Yes.  I didn't understand how the -- how the

12  guidelines worked.  And when he said that if you're going to do

13  20 years, there's a rebuttable presumption that you won't

14  appear for trial and you should be held without bond, I thought

15  that meant if you're actually likely to do 20 years, not if the

16  maximum theoretical sentence is 20 years.

17     Q.   Since then you've had time to learn about the

18  sentencing guidelines and how that actually works?

19     A.   Yes.  And apparently my exposure is much less dire

20  than I thought it was at the time.

21     Q.   Also at the time, we heard you talk plenty about

22  this, is it fair to say that you also -- and I realize I'm

23  leading here a little bit, your Honor, but to try to move

24  things along, if the government isn't objecting -- you also

25  were making reference to I'm just here because I don't have a

1   license to trade and why should I have to have a license.

2              Since then you've learned through the discovery

3   process, particularly in regard to Mr. Freeman, that the

4   government is alleging more than just people trading without a

5   license?

6        A.   Well, yes.  They're alleging that our trading

7   without a license enabled other people to commit fraud is my

8   understanding.

9        Q.   Right.  So at the time that you're making the

10  remarks you made in the phone call, you're just thinking, I'm

11  in here because bank people don't want me trading Bitcoin

12  without a special license they have.  You weren't aware that

13  the government had this whole other series of allegations,

14  particularly involving Mr. Freeman, which have yet to be

15  proven, but you weren't aware that all that evidence was out

16  there until you started reviewing that with us, right?

17       A.   Yes.  I knew that there had been frauds, where money

18  had been deposited to our account, where somebody had been

19  tricked into depositing money into our account, but as far as I

20  knew, that was a fraud where we were the victim.  Because what

21  happened is that that money was then pulled back out off your

22  account and returned to the person who had been conned.  We had

23  already sent out the Bitcoin, so we were the ones who lost

24  money when that happened.

25       Q.   But, now, you -- now you're aware, and I'm not

1    asking you to comment on whether --

2                    (Unidentified voices.)

3              MR. BROWN:  Someone's unmuted here.  Is there

4    somebody, a Thomas Estes, if you could mute yourself, please.

5        Q.    But you are aware now that the government seeks to

6    introduce quite a bit of evidence that -- of transactions that

7    while didn't involve you directly, but in which it's alleged

8    people were scammed out of money so that a third party could

9    get Bitcoin in exchange for that money?

10       A.    I have -- I have seen some of the 302s.  I don't

11   know how many of those people were not made whole.

12       Q.    But you're aware that's the allegation, that --

13       A.    I'm aware that that allegation exists now, yes,

14   and it's more understandable that the state feels it has an

15   under -- an under -- an interest in preventing this, having

16   seen those allegations.

17       Q.    All right.  But at the point, again, you didn't have

18   that knowledge, you were being held without bond, and you were

19   upset; right?

20       A.    Yes.

21       Q.    Okay.  Now, one of the things that the government

22   alleges -- and this is, again, by way of background, before I

23   get into your actual remarks.  The government's alleging in its

24   objections that you may have access to a large amount of money.

25              Do you, in fact, personally have, really, any

1    resources at this point you can access?

2        A.    No.  I have no -- I have -- I have probably got

3    access to less than $10,000 that I know of.

4        Q.    And you personally do not have -- I think you had a

5    passport, but it's expired; is that correct?

6        A.    I'm pretty sure it expired.  I went to Canada for my

7    uncle's funeral, but that was I'm pretty sure over a decade

8    ago.

9        Q.    Okay.  So if you -- if you wanted to flee, your

10    resources are less than $10,000 and you currently don't have a

11    valid passport to leave the U.S.?

12        A.    Yes.  And as I said on the recording, not only do I

13    not want to flee, if I lose my life and America ends up free,

14    that to me is a win.  I want to see America free more than I

15    want to be personally free.

16        Q.    You mentioned $42,000 belonging to the church, the

17    church that you founded.  That 42,000, is that currently

18    subject to a forfeiture action?

19        A.    I believe -- I believe that that's been seized.

20        Q.    Okay.  And so that $42,000 is not available to you

21    right now if you were to get out of jail; is that correct?

22        A.    It is not.  Even if it was, I assume I would be

23    under bond conditions not to convert it, so there wouldn't be

24    anything I could do until after the trial with it.

25        Q.    All right.  So let me talk about this -- there's

1    really six specific remarks during the 16-minute phone call

2    that I think were of big concern to the magistrate judge.  The

3    government has certainly raised them as its concerns.  The

4    magistrate judge has indicated that the reason for your

5    detention is these remarks; that absent these remarks, there

6    wouldn't have been grounds for detention.  So I want to talk

7    about them one by one.

8              We just heard them.

9              THE COURT:  Wait a minute.  Wait a minute.  What did

10   you just say again, Mr. Brown?

11             THE COURT:  I want to make sure I understand your

12   argument.

13             MR. BROWN:  I guess I am engaging in argument in the

14   middle of a question.  I apologize for that.

15             THE COURT:  It's okay.

16             MR. BROWN:  I'm just trying to highlight the

17   importance of these questions to my client; that these are --

18   these seem to be the main basis for him -- for the original

19   order of detention --

20             THE COURT:  Oh.

21             MR. BROWN:  -- as the magistrate indicated absent

22   these remarks, there wouldn't have been grounds, based on his

23   history and ties to the community, to detain him.

24             THE COURT:  Yeah.  Can you direct me to -- can you

25   direct me to where Judge Lynch said that?

1      MR. BROWN:  Yes, your Honor, I can.

2      THE COURT:  Because I'll be honest with you; I'm not

3  particularly focused on the phone call at all.  I mean, I --

4  you know, I think lots of phone calls like that happen in the

5  jail that people are angry about the charges, very angry at

6  their lawyers.  It's not uncommon.

7      There was a few things he said, that Mr. Nobody

8  said, that I realize are provocative if taken seriously.  They

9  are.  But, I mean, it's not my main focus.

10      But, yeah, show me in Judge Lynch's order what

11  you're referring to.

12      MR. BROWN:  So Judge Lynch's order, for the record,

13  is Document 76.

14      THE COURT:  Yup.

15      MR. BROWN:  On page 3 of that order, the second

16  paragraph, Judge Lynch says, I quote -- and this is, to put it

17  in context, after he's analyzed the case law.  He says:  The

18  government requests detention based on its contention that the

19  defendant poses a danger to the community.

20      THE COURT:  Yeah.

21      MR. BROWN:  In support of detention, the government

22  points to the extensive weight of the evidence, the defendant's

23  alleged active substance abuse, and his position that he is not

24  in need of treatment.

25      THE COURT:  All right.

1              MR. BROWN:  He's a marijuana advocate, your Honor.

2    That's the reference there.

3              And his criminal record which includes drug offenses

4    and convictions for criminal contempt and obstruction of

5    government administration.

6              And this is the key part, we believe, of the order.

7              Those factors, while relevant, standing alone would

8    likely not support a dangerousness finding.  However, when one

9    adds the threatening context of a recorded conversation while

10   the defendant was incarcerated, the balance tips in favor of

11   detention.

12             THE COURT:  All right.

13             MR. BROWN:  So it appears the reasoning --

14             THE COURT:  I get it.

15             MR. BROWN:  Yeah.

16             THE COURT:  I see what you're saying.

17             To orient me properly on the legal question, this is

18   a presumption case, though, right?

19             It's not?  So what's the -- what's the statutory

20   maximum.

21             MR. BROWN:  Statutory maximum, I believe, on one

22   count is 20 years.

23             THE COURT:  Give me a moment.

24             MR. BROWN:  I'm sure Mr. Aframe will correct me if

25   I'm wrong --

1          THE COURT:  Yeah.  Mr. Aframe, you were shaking your

2    head saying it's not a presumption case.

3          MR. AFRAME:  It's a 20-year maximum, but it's not a

4    controlled substance offense, so it's not --

5          THE COURT:  Right.

6          MR. AFRAME:  (Shakes head.)

7          THE COURT:  Right.  Yeah.  Not a drug case.  Yup.

8          MR. AFRAME:  Correct.  No.

9          MR. BROWN:  And I think that is reflected in the mag

10   order which is not a presumption but finding that the

11   government had met its burden of clear and convincing evidence

12   that he constituted a danger and there were no conditions that

13   would protect.  Specifically it seemed the concern of based on

14   the phone call was the law enforcement officials of the state

15   of New Hampshire.

16         THE COURT:  Yeah, I see.  Yeah.

17         MR. BROWN:  That's how I would summarize it.  I hope

18   that's fair.

19         So I will speed it along through these issues

20   because I understand what the Court's saying about it may have

21   a different level of concern here.  But for the record, because

22   that is the basis, to me, of the order, if I can go through

23   these six briefly, your Honor.

24         THE COURT:  Understood.  I just want to -- I just

25   want to make sure I'm following here.

1          MR. BROWN:  Yes, your Honor.

2          THE COURT:  And by the way -- by the way, I want --

3    Attorney Brown, I want you to take as much time as you need on

4    this phone call, you know, and develop whatever record you

5    want.  I'm not trying to move you along quickly by saying I'm

6    not focused on the phone call.  I'm just trying to signal that,

7    you know, the phone call, while it does sound a little

8    egregious, I think, to people who weren't used to kind of

9    thing, you know, criminal detention and release, it is -- it's

10   not something that's surprises me a lot, given the

11   circumstances of the case, the charges, the defendant's

12   political attitude.  It all is part of the mix and I'm trying

13   to give -- I'm trying to -- I'm trying to hear his call in

14   context as opposed to just take it right at face value.  That's

15   all I'm saying.

16         MR. BROWN:  Thank you, your Honor, for explaining

17   that, and I do appreciate you giving us as much time as we

18   need, your Honor.

19         And I'll also add as a remark -- and this is our

20   fault; we could have asked for the whole call to be played for

21   the magistrate judge.  He only had the benefit of hearing these

22   six excerpts in a vacuum.  And that's not a dig on the

23   government; they have a right to present those that way.  We

24   could have said, well, we want you to listen to the whole

25   thing.  We didn't do that at that time.

1          So the Court now has had the benefit of hearing the

2    entire thing in context, as you said.

3         Q.   So, Rich, number one, you know, I'm paraphrasing,

4    corrupt piece of shit attorney, MF'r needs to die, was that an

5    actual death threat towards your court-appointed attorney or

6    was it rather an expression of frustration?

7         A.   Well, it wasn't a threat grammatically, it was a

8    curse.  And, no, it was certainly not -- I certainly had no

9    thought that, you know, my old AA crony was going to go out and

10   whack my lawyer.  Good God, you know.  It was just a matter

11   of -- it was just a matter of blowing off -- off steam and, you

12   know, it -- it was a curse.

13        Q.   Okay.  So, in fact, I think you mentioned to me the

14   other day knowing now what you know about how the process

15   works, I think you said you felt like you owe him an apology.

16        A.   Yeah.  Well, the thing -- there are a couple of

17   things that I didn't know.

18          The first thing that I didn't know when that phone

19   call was being made was that Ian Freeman was still being

20   detained.  I thought that even the alleged ringleader had

21   gotten out the same day we were arrested and I was still

22   sitting in here, because he told me not to try to get bond.

23   And -- which would have been an insane inversion because, you

24   know, I was a very small part of this whole mess.

25          And then the -- the other thing is I didn't know

1   that the prosecution only requested that two defendants be

2   detained.  So --

3        Q.    You -- you weren't even aware that the prosecution

4   hadn't sought detention on four of the folks?

5        A.    No.  I thought the prosecution had just demanded

6   detention on everybody as a matter of course and all five of my

7   codefendants, including the alleged ringleader, had gotten out

8   while my attorney had told me, oh, no, just sit in jail and

9   then didn't call me for a week and a half.

10            That -- so it was his -- if you're listening to

11  this, John, sorry about that.  I didn't understand the

12  situation.

13            And I told him as such by phone when -- when we --

14  when he finally did get in touch.

15            The other frustration was that he takes collect

16  phone calls from jail only between 3:00 p.m. and 5:00 p.m. and

17  the one hour a day I was allowed out of my cell never fell

18  between those hours.  So I literally couldn't even call him.

19       Q.    And then you made -- you made some references to,

20  you know, various foul language, evil pieces of shit that run

21  the system, and anybody working in the system is evil.  Was

22  that meant as a threat or is it just a statement of your

23  opinion about the banking system and the financial system in

24  the United States?

25       A.    It was a -- a badly phrased statement of opinion.

1    Certainly there -- there's -- I mean, even grammatically

2    parsing that, there's no threat you can find in there.  There

3    is just -- you know, foul words.

4         Q.    Now, your friend -- it's not you who makes reference

5    to a .50 cal, but I believe your friend says, I couldn't shoot

6    them in the head with a .50 cal, but I could go after them with

7    my words.

8              Was that a reference to him saying we don't use

9    violence, but we certainly use words and invective, we

10   certainly put our opinion out there?

11        A.    Yeah.  I think you said I knocked them over with my

12   words.  And I said really.

13        Q.    Okay.  And you've never said anything about a .50

14   cal or shooting a government agent.  That was him saying I

15   can't do that.

16        A.    I -- I did not at that point.  At one point later in

17   the phone call I said somebody needs to start shooting cops,

18   which we'll get to, I'm sure.

19        Q.    Well, that's my next question.  That's the most

20   egregious remark, it seems to me.

21             At that point -- and, again, we've gone through your

22   state of mind in the jail -- that general statement of cops,

23   were you referring to the cops in your case or were you

24   referring to cops that had been -- that had -- you'd just read

25   in recent article about another person who had been killed by a

1    seemingly unlawful action of law enforcement?

2        A.    Yeah.  I mean, what I was responding to and what was

3    on my mind when I made that comment was -- it wasn't from

4    reading, it was from my previous phone call to my friend

5    Melanie who had given me the news that yet another innocent,

6    unarmed black person had been killed by police.  And this was

7    before -- another thing that I did not understand is I did not

8    expect the killer of -- of George Floyd to be brought to

9    justice.

10            And so what I was -- what was going on in my head,

11   and I didn't -- that didn't enunciate at all, but what was

12   going on in my head is that people need to start shooting back

13   in self-defense if the police are going to be killing them with

14   impunity.  And I must say I was very much relieved when George

15   Floyd's killer was brought to justice and I was also, frankly,

16   very much surprised by that.

17       Q.    We've covered this a little bit, but your reference

18   to getting heroin and killing yourself, that's when you

19   believed -- what, you're -- you're 52; is that right?

20       A.    Yeah, I'm 52 years old.  So what I was imagining is

21   a future where I spend 22 years or 20 years in prison and then

22   got out at the ripe age of 72 to be homeless for the rest of my

23   life because I hadn't had a chance to build up anything to live

24   on, any kind of retirement.

25            So it was a very bleak future that I was imagining

1   for myself at that time.

2        Q.   All right.  And then this -- this boogaloo, you

3   know, now, okay, this is a word that's being thrown around in

4   popular culture.

5             Is it your understanding this word can have a lot of

6   different meanings to a lot of people?

7        A.   Yeah.  I would say it's - I mean, certainly it's not

8   in Merriam-Webster's Unabridged.

9        Q.   So for some people, it may mean an actual -- their

10  desire to engage in an armed, you know, civil war or overthrow

11  the government; for some people it could mean that, right?

12       A.   It could mean that, and that would result in what I

13  call the boogaloo perhaps.

14       Q.   But for other people, could it also just mean that

15  they generally believe that at some point, whether it's due to

16  hyperinflation, collapse of the dollar, whatever it may be, due

17  to a lot of different issues that we have that at some point

18  the system itself will collapse on its own?

19       A.   Yeah.  The boogaloo, to me, if you were to -- if I

20  was to define it for Merriam-Webster, it would be that state of

21  disorder that would follow the breakdown of civil society as a

22  result of any one of a number of features.  I can see it

23  happening if Texas decides to secede; I can see it happening

24  from hyperinflation, where all the sudden the government can no

25  longer pay its employees in any meaningful way because the

1    dollar is worthless and there -- and the military and law

2    enforcement just say, screw you guys, we're going home; it

3    could be any number of things that could set off that state.

4    But the boogaloo itself is that state of disorder that is

5    imagined when it's just every man for himself.

6         Q.    Okay.  And one last thing of concern from the phone

7    call, and understandably the government raises this because you

8    make a remark, I wish I hadn't forgotten to push the panic

9    button.

10         Now, can you make -- can you explain to the Court

11    what that means?  Is that some kind of device to call a militia

12    or to set off an explosive or something violent in nature?

13    What is that?

14         A.    No, it's completely nonviolent.  I write a cell

15    phone app.  I'm the chief programer on a cell phone app called

16    Cell 411.  And basically this -- this cell phone app is a way

17    of -- we call it crowd sourcing emergency management.  So you

18    hit a -- a panic button on your phone and that sends out a

19    message to other users of the app who happen to be your friends

20    that say this person is at this place and he needs help.

21         And they -- and it also turns on the camera on your

22    phone so that you can livestream to a server what's going on in

23    front of you.  And that's important because frequently if

24    people see that you're filming them doing something bad to you,

25    they'll take your phone away and delete the video.  But --

1      Q.   You're --

2      A.   But if you've already streamed it to a server, they

3  can't do that.

4      Q.   For example, that would have been useful that day in

5  Keene -- in the town center of Keene when those hooligans from

6  out of town were attacking the female is to have something like

7  that where you've got a recording of it you could show to law

8  enforcement and then -- and that you could show to other

9  people.

10     A.   Exactly.  And that night actually in particular my

11 phone was stolen by that group of hooligans because I dropped

12 it when I picked up the bar.  So my video of that incident was

13 lost, but yet it was the video of that incident that saved me

14 in court.  If they have -- if we hadn't had video of what

15 happened to us that night, I probably would have been violated

16 for much worse for having that monopod or using that monopod in

17 the way that I did because under New Hampshire law, it didn't

18 become a weapon until it was used in a threatening manner.

19     Q.   If Judge Laplante grants you some conditions of

20 release that allow you to get out of jail, are you willing to

21 abide by any conditions the Court sets?

22     A.   Yes.  I mean, assuming they're not just egregiously

23 immoral, yes.

24     Q.   Well, I don't expect the judge to set egregiously

25 immoral conditions if he does grant your release, so --

1    A.    Something that would require me to rob old ladies or

2    something.

3    Q.    For example, you and I and Ms. Allen have been

4    through the numerous types of conditions in the pretrial

5    detention statute; for example, staying in the District of

6    New Hampshire, refraining from trading in coins, which has been

7    a condition on the other defendants; no contact with the other

8    defendants except for maybe possibly for the Free Talk Live

9    radio business.  Conditions like that, if the Court orders

10   those, you have no problem following those, correct?

11   A.    Well, in order to gain a release, I would have to

12   give my word that I would obey those restrictions.  And being

13   who I am, my word is very important to me.

14   Q.    You would give your word?

15   A.    Yes.  If I give my word, I keep it.

16   Q.    How long have you lived in New Hampshire, sir?

17   A.    I've lived in New Hampshire for a little over a

18   decade.  I moved in 2000 -- oh, actually, I remember the date.

19   I moved February 15th, of 2009.

20   Q.    Now, we see a lot of friends and supporters on this

21   call.  Is it fair to say that you have dozens or scores of

22   friends, very close friends, in the Keene community and

23   throughout the state of New Hampshire?

24   A.    Yes, I think so.  There's a -- there's a large group

25   of people, some of whom say they were inspired to move here by

1    my actions, and I don't want to lose those people.

2         Q.    Who is Tamsin Thorn?

3         A.    Tamsin Thorn is my girlfriend and, if we manage to

4    get it together, the future mother of my child.

5         Q.    Okay.  And where does she live?  What town in

6    New Hampshire does she live in?

7         A.    She lives up in Whitefield.  I think I've got that

8    right.

9              MR. BROWN:  Now, she's written a letter which, your

10   Honor, is incorporated as an exhibit from our prior motion.

11        Q.    And in that letter she said that you would be able

12   to stay with her during the pendency of the case.  Where --

13   would you agree to stay at that address?

14        A.    Yes.

15        Q.    Okay.  Now, you have -- your parents are still

16   alive; is that right, sir?

17        A.    Yes, my parents are still alive.  There's a

18   reference to them on the phone call.  They are elderly.

19   They're both in their -- in their 90s, but they're still alive.

20        Q.    All right.  And they live in the state of Michigan?

21        A.    They do.

22        Q.    Okay.  So, you know, if you were to flee the

23   United States while you're out on bond, you know, there would

24   be a chance you may never get to see them again.

25        A.    A likelihood, you know.  That would be permanent

1    exile from the country and I -- I have promised my mother that

2    if my dad goes, I'm going to go back there for a while and make

3    sure she's okay.

4          Q.    Now, you made reference to an app you were

5    programming.  You are a trained computer programer; is that

6    correct?

7          A.    That's right.

8          Q.    Now -- and, of course, not crypto trading related,

9    but would you be seeking employment as a computer programmer

10    while on bond?

11          A.    Well, I would be continuing on Cell 411 and, yes,

12    that would be my primary work as well as -- as well as my -- my

13    Evangelistic pursuits, which the church pays -- basically I

14    work for food for the church.  They feed me.

15          MR. BROWN:  All right.  I -- I have no further

16    questions for Mr. Nobody, your Honor, just argument after that,

17    and so I tender the witness.

18          THE COURT:  Let me ask you a question, Mr. Brown,

19    just based on that last number of questions.

20          Mr. Nobody explained that he has been in the state

21    about ten years.  Do you know where he was living before that?

22    And there's a big gap -- I'm looking at his record and there's

23    a big gap between 1993 and I'm assuming maybe it was Michigan,

24    I don't know, and then 2009 when he had his first New Hampshire

25    arrest.

```
 1                What -- do you know when he arrived in
 2   New Hampshire?
 3                MR. BROWN:  If I can ask him, Judge, I can establish
 4   that, if that's all right.  I know he lived in Florida before
 5   New Hampshire.  He had a computer programming job in Florida,
 6   was married.  Unfortunately, his wife passed.  He's originally
 7   from Michigan, which is where his parents reside.
 8                May I ask him a few more questions to try to
 9   satisfy --
10                THE COURT:  Yeah.
11                MR. BROWN:  -- the Court?
12                THE COURT:  Yeah.
13        Q.    Again, what year did you arrive in New Hampshire,
14   sir?
15        A.    I arrived in New Hampshire on February 15th of 2009.
16        Q.    Where did you live before that, sir?
17        A.    Before that I was going to college in Michigan for a
18   while and -- back in my parents' hometown.  And before that I
19   was working as a computer programmer in Florida.  After my wife
20   died, I kind of abandoned my career --
21        Q.    How many years --
22        A.    -- for a while.
23        Q.    -- were you in Florida -- approximately from what
24   year to what year were you in the state of Florida?
25        A.    Approximately from 1995 to 2005.  And I -- I worked
```

1    as a computer programer that entire time for several Fortune

2    500 clients, as well as at least one startup.

3        Q.    And from 2005 until your move to New Hampshire,

4    would that be the period you were back in Michigan going to

5    school and staying with your parents?

6        A.    Yeah.  After my wife died, I had kind of a collapse.

7    And so I wanted to do something relaxing, so I went back to

8    college and studied Shakespeare and Middle Eastern history and

9    just all kinds of -- just to keep my mind working.

10              MR. BROWN:  Does that satisfy the Court's --

11              THE COURT:  Yeah.

12              MR. BROWN:  -- curiosity on that issue, Judge.

13              THE COURT:  Exactly.  Yup.  Thank you.

14              MR. BROWN:  So, again, I do tender the witness to

15    the government.

16              THE COURT:  Okay.  Cross-examination.

17                          CROSS-EXAMINATION

18    BY MR. AFRAME:

19        Q.    Good afternoon, Mr. Nobody.

20        A.    Hello.

21        Q.    So what I understood from the essence of the

22    questioning that we just heard is that at the time you were

23    really upset about your case and based on some information

24    right now, you're less upset; is that fair?

25        A.    Yeah.  I mean, I would -- I think the best word is

1    probably terrified, and I am no longer in that state.

2        Q.    In that state, you were pretty volatile; you'd agree

3    with me about that?

4        A.    Oh, yeah.  I was very angry.

5        Q.    And you were -- you know, you did say that people

6    needed to start shooting pigs, right?

7        A.    Yes, I did.

8        Q.    And that -- I mean, that's slang for people should

9    start shooting police.

10        A.    Yes.

11        Q.    And today is July 23rd, 2021, and you've been in --

12    in jail now since sometime in March, right?

13        A.    Yes.  I've been in jail for four months now, just

14    over.

15        Q.    And you're aware that your trial is sometime

16    probably in May of 2022?

17        A.    I -- the last date that I heard bandied about it was

18    July, but it could be May.  That's one of the dates I've heard

19    mentioned.

20        Q.    Okay.  And my question is on the -- there's a long

21    time between now and then, correct?

22        A.    Yes.

23        Q.    And do you expect a lot of different things are

24    going to happen in your case?

25        A.    I do.  I don't expect in my case and -- I don't

1  expect things and, as a matter of fact, my attorney informs me

2  that it is impossible for me to actually get what I thought

3  might happen --

4            MR. BROWN:  I'm going to object.  I would object at

5  this time and ask you to stop.

6            If I may, your Honor, I don't think Mr. Aframe meant

7  this, but I think it's going into the area where my client is

8  now talking about privileged conversations about trial

9  strategy.

10            THE COURT:  Yeah.

11            MR. BROWN:  I don't think that's how Mr. Aframe

12  meant the question --

13            THE COURT:  No.

14            MR. BROWN:  -- for the record.

15            THE COURT:  Understood.

16            Mr. -- your conversations, Mr. Nobody, with your

17  attorneys are all privileged and --

18            THE DEFENDANT:  Okay.

19            THE COURT:  -- you don't want to give that up.  And

20  if you talk about your conversations with them, you could give

21  it up.  So when you answer the questions, don't refer to your

22  conversations with your lawyers.

23            THE DEFENDANT:  Okay.  All right.  Let me say that

24  to the best of my knowledge and belief then, things cannot

25  possibly get as bad as I thought they were when I made that

```
 1    phone call.
 2        Q.    Okay.  But -- but there remains a lot of unknowns
 3    out there I guess is my only point.  Right?
 4        A.    Certainly.
 5        Q.    And whether it's 20 years or less, you do understand
 6    you face a period of incarceration as you're currently charged?
 7        A.    Yes, it's certainly possible.
 8        Q.    And you I think said that you have, and it's evident
 9    from this phone call, that you have a lot of supporters?
10        A.    I do.
11        Q.    And that people have come to New Hampshire because
12    they support you?
13        A.    True.
14        Q.    And it's fair to say that you're a leader of people
15    because they respond to you?
16        A.    I like to think so.
17        Q.    And in that call, when you were upset, you were
18    talking about shooting police to a friend.
19        A.    Uh-huh.
20        Q.    Correct?
21        A.    That's true.
22        Q.    And maybe that person didn't listen to you, it
23    doesn't seem like he did in that call, but there's lots of
24    other people out there.
25        A.    Well, he did listen to me in that call and he's
```

1    listened to me for ten years.  He's a confidant that I have

2    known since the day I moved to New Hampshire and so he is

3    somebody who knows what part of my output needs to be filtered

4    out and discarded.  He is --

5         Q.   Okay.

6         A.   -- somebody that I use as a sounding board so that I

7    don't say stupid things in public.

8         Q.   And can you tell -- can you -- does -- does everyone

9    that you know respond to you that way?

10        A.   Probably not everyone, which is why I'm very careful

11   when I -- when I'm in a very dark mood, I'm very careful who I

12   confide to.

13             Now, obviously, amongst my unintentional confidants

14   was a Securus employee or a district attorney who didn't know

15   how to interpret what I was saying, but that's not normally the

16   case.  Well, I kind of think the FBI might listen to a lot of

17   my phone calls, but it's -- at least it's -- I don't think the

18   FBI is going to go out and act on anything that I recommend.

19        Q.   And in a -- you know that the task of the

20   government -- it seems to me you're very familiar with your

21   case.  In the government's response here, they attached a

22   Twitter -- I think it's Twitter -- feed where you were

23   suggesting that it's time for the gallows, right?

24        A.   Actually, what I said was this is the same

25   government that tells us that marijuana is more dangerous than

1  oxycodone, I think, where are the guillotines.

2      Q.   Excuse me, it was the guillotines.  And the

3  guillotines is used to kill people, right?

4      A.   Well, the guillotines are actually used as a means

5  of execution.  As far as I know, they've only been used by the

6  state to kill people.  So they are a means of administering the

7  death penalty legally.

8      Q.   Okay.  And you were distributing that comment pretty

9  widely, right?

10      A.   I was, just as Kathy Griffin distributed a

11  photograph of herself holding up Donald Trump's head like a

12  trophy.  The rough-and-tumble of political speech is and always

13  has been volatile and it has always contained a great deal of

14  hyperbole.  This is not -- and symbolic speech and things --

15  imagine if Kathy Griffin were applying for -- for bond here.

16  Would you say that she should never, for the -- for the rest of

17  her life, be eligible for bond because she took a photograph

18  with a facsimile of Donald Trump's head?

19      Q.   No, I'm not saying that at all.  I guess my question

20  to you is when you're volatile, when you're upset, you make

21  statements that suggest violence, is that fair, or at least

22  that's the evidence before us?

23      A.   When I'm volatile and when I'm upset, I may make all

24  kinds of statements.  And I'm pretty careful who I make them

25  to.

1     Q.    And today, July 23rd, having known about this call

2   for a long time, you provided the Court with various

3   explanations about why or that you were parsing the words in

4   various ways.  And I appreciate all of that, right?  You've

5   told all that to the Court today, correct?

6     A.    That's true.

7     Q.    But the hearer of your call didn't get the -- the

8   commentary or the footnotes that you've provided today, right?

9     A.    The hearer of the call is intimately aware --

10     Q.    Answer my question.  Did the hearer of the call get

11   the benefit of all of the parsing and explanations that you

12   provided to the Court today, yes or no?

13     A.    He got it in a different form.

14     Q.    Okay.

15     A.    In the form of having known me for ten years.

16     Q.    Okay.  And the Court -- and what you're asking the

17   Court to do is to say that when you're obviously in an angry

18   state, you're going to always know exactly who you're talking

19   to, how they will interpret your words, not act on anything you

20   say?

21     A.    I think it's -- yeah.  I mean, I don't -- I don't

22   vent to just anybody, generally, I vent to people who know me

23   well, who -- who can handle me.

24         You know, I went to AA for 22 years and there are a

25   lot of things that I said to my sponsor that I didn't say to

1   anybody else.

2       Q.   Okay.  And so the -- the crux of it is this guy was

3   special, you would never -- no matter how angry you got or how

4   badly your case goes, how much support you think you need, you

5   just wouldn't say those things to other people?

6       A.   I -- I do not believe that I would, willy-nilly.  I

7   certainly -- anybody who knows me and anybody who has listened

8   to me for any period of time knows what my beliefs are about

9   the appropriate use of violence, and the appropriate use of

10  violence is to defend yourself from violence.

11      Q.   Okay.  And you agree that in the call you started

12  out pretty calm, right?

13      A.   Oh, yeah.

14      Q.   And as certain comments were made to you, you

15  escalated pretty quickly, didn't you?

16      A.   Yes, I did.  But I never left the -- left the area

17  of constitutionally protected speech.

18      Q.   You think that saying that someone should go shoot

19  the police is constitutionally protected speech?

20      A.   I think wishing bad things to happen to police, yes.

21  Exhorting bad things, if I had solicited somebody to do that,

22  that would leave the -- the realm of constitutionally protected

23  speech.  If I had said I was going to do that, if I had said

24  I'm going to go shoot a cop, then that would have been criminal

25  threatening and that would have left the realm of

1    constitutionally protected speech.

2            But I don't like the police and I wish somebody

3    would go shoot them, that remains in constitutionally protected

4    speech, I believe.  Obviously we've got a whole panel of

5    lawyers we can consult on that here.

6        Q.    That's true.

7            And drugs were found in your house, right?

8        A.    Allegedly.

9        Q.    Okay.  And --

10       A.    I wasn't there when the house was searched.

11       Q.    Okay.  And you do have a prior record, correct?

12       A.    Yes, I was arrested by the FBI Joint Terrorism Task

13   Force for selling four ounces of marijuana on several

14   occasions.  Rather outside their normal bailiwick, but when

15   you're a political target you're a political target.

16       Q.    And just so I understand -- I'm going to stop with

17   this.  Just so I understand your point, the testimony before

18   the Court that you're -- is that you did say those things, they

19   do have a violent aspect to them but you were talking to a

20   specific person, at a specific time, and that won't happen

21   again and everybody knows you, and nobody would act on it.

22       A.    Well, I'll say this.  I have been running my mouth

23   on a syndicated radio show on 200 different FM radio stations

24   in the United States for at least nine years and nobody has

25   shot anybody at my behest yet.  So -- so I'm doing pretty good

1   on that respect.  I've been able, I think, to -- to communicate

2   myself in a way that the people to whom I communicate

3   understand my meaning and recognize when I use hyperbole.

4        Q.   And you understand that your case is a high-profile

5   one, right?

6        A.   Oh, I do.

7        Q.   And --

8        A.   And I hope to make it higher profile.

9        Q.   And people care a lot about it, right?

10       A.   I certainly do, yes, and many -- yeah, many others,

11  too.

12       Q.   And tensions because -- I mean, you already

13  explained it, but tensions, at least the way you viewed the

14  case, I don't know how you view the case today, but at least

15  the way you viewed the case in April, right, was that this case

16  was an unfair overreach of the government?

17       A.   Oh, I believe it is, and I hope to prove that in

18  court.

19       Q.   Okay.  And other people share that view, right?

20       A.   Yes.

21       Q.   And you're talking at least to one of those people

22  about violence against the government?

23       A.   Are you suggesting that nobody should ever criticize

24  the government because somebody might get mad and shoot cops?

25       Q.   I'm not suggesting anything.  I'm trying to ask you

```
 1   questions just to understand --
 2        A.   Okay.
 3        Q.   -- where we are.
 4             So my question is just this -- there's a lot of
 5   people who care a lot about this case; it's a high-profile
 6   case; there's a lot at stake.
 7        A.   Yes.
 8        Q.   Do you agree with that?
 9        A.   I do.  There's a lot at stake in this case.
10        Q.   And in talking about that case, you made statements
11   that relate to violence against law enforcement, correct?
12        A.   To a private spiritual adviser, I did.
13             MR. AFRAME:  Okay.  Nothing further.
14             THE COURT:  Are you talking about your sponsor?
15             THE DEFENDANT:  He was not my sponsor.  He was a
16   friend of mine that I had attended -- and I hate to break his
17   anonymity, but we haven't said his name -- that I have attended
18   meetings with.  That's who I was -- who I was having this phone
19   call with, somebody who knows me intimately and knows that
20   sometimes I'm going to go out and primal scream, but that's all
21   it is, it's a primal scream, and then it's gone.
22             THE COURT:  Thanks.
23             Any redirect, Mr. Brown?
24             No?  You're muted.  You're muted, Mr. Brown.  It
25   looks like you said no, but --
```

48

1          MR. BROWN:  Sorry.  I keep forgetting.  No, sir.

2     Just argument at this point.

3          THE COURT:  Understood.

4          Any more evidence from anybody?  None from the

5     government and none from Mr. Brown.  All right.

6          MR. BROWN:  Right, your Honor.

7          THE COURT:  All right then.

8          It's your motion, Mr. Brown.  I'll let you go first

9     on the argument.

10          MR. BROWN:  Yes, sir.  Thank you.

11          So Document 93 is the government's objections and a

12     lot of this has already been covered in previous remarks, but I

13     wanted to zero in on a few things just to clarify.

14          On page 6 of that document, the government likens

15     Rich Paul, which was my client's legal name before he changed

16     it to Nobody, at -- where it's @Nobody4Governor, saying somehow

17     the government thinks that we are dangerous, but prison is

18     safe; where are the guillotines, then likens it to an image of

19     a noose at -- during the January 6th, which they refer to as

20     riots, I guess some people look at that differently, that was

21     erected in front of the Capitol and then another article about

22     a guillotine erected in front of the Arizona Capitol in the

23     same regard.

24          The Court is well aware -- I don't think this is

25     relevant at all to this case.  There's no even evidence that my

1    client's a Trump supporter, but I think the Court's also well

2    aware just from the media that nobody was guillotined or hung.

3    The only person killed during that event was a protestor who

4    was a military veteran who was shot by a Capitol police

5    officer.

6            So, you know, that's generally --

7            THE COURT:  Nobody gets detained in my court based

8    on their political positions or candidates they -- that they

9    support.

10           MR. BROWN:  And I do not believe that to be the case

11   either, Judge.  I was just lodging my objection that that

12   argument was raised, respectfully.

13           There's also a reference to the criminal history.

14   There are some references made here.  The criminal history --

15   and the Court has that history -- is limited almost solely to

16   drug charges, specifically marijuana, which my client is an

17   advocate of.

18           There is a charge of obstruction of government

19   administration that's mentioned, which I believe was a

20   misdemeanor in the state of New Hampshire.  That had to do with

21   his activism.  So just to put -- that's not so much as an

22   objection to their objections, but rather just to put in

23   context what they're saying there.  The government has already,

24   I believe, stipulated that the remark on page 8 about violating

25   probation with a dangerous weapon, we've both come to realize,

1  both sides, that that was incorrect due to a viewing of that

2  hearing.  That was not the finding of the Court.

3       And then the government gets into the strength of

4  its case, which is a factor under the detention statute.  The

5  government does correctly say that my client is charged with

6  conspiracy to operate an unlicensed money servicing business,

7  which essentially means the selling of cryptocurrency in

8  exchange for cash without a license, that is one of the counts,

9  and that there's a -- there was a contract between himself and

10  Mr. Freeman -- which we have in evidence, so that's not in

11  dispute -- to do just that.

12       The government then goes on, really, to talk about

13  the strength of the case against Mr. Freeman more than the

14  strength of the case against Nobody.  And this is important,

15  your Honor, because, first of all, the Court has granted

16  release to Mr. Freeman, who is the -- and I'm not bashing on

17  Mr. Freeman here; he's innocent until proven guilty as well --

18  but the way the indictment is spelled out and the way the

19  evidence is in the case is the main target of the case.

20       And what the -- the gravamen of the government's

21  case -- and I'll let Mr. Aframe jump in if he disagrees how

22  I'm stating this, but I'm trying to boil it down -- is that

23  Mr. Freeman was having friends, including Nobody and some of

24  the other defendants, open bank accounts because the banks

25  wouldn't do it for him anymore.  The banks were shy about

1    trading with Bitcoin buyers and sellers for various reasons.

2    There are risk levels for the banks.  And that in doing so

3    these folks were misleading the banks as to the purpose of the

4    bank accounts; they were essentially acting -- as I think both

5    sides, Mr. Aframe and I, have been referring to in our

6    discussions -- as straw bankers.

7           But then the government goes on to -- I believe to

8    attempt to prove at trial, if we get there, that Mr. Freeman

9    was selling Bitcoin to criminals who were defrauding people out

10   of the cash to buy the Bitcoin.  In other words, a criminal

11   engages in a romance scheme or some type of other scam with

12   a -- with an unsophisticated or elderly person, a vulnerable

13   individual, and then that person says, okay, I'll pay the

14   money, and then that person says, well, you have to pay it to

15   this guy, but you have to tell him you want to buy Bitcoin.

16   And then that Bitcoin -- so that Bitcoin then goes to that

17   third party, which by its nature Bitcoin is very hard to trace

18   the transmission of it, and so that third-party criminal who

19   may not even be in the United States, or may be right up the

20   road, is able to launder that criminal cash into Bitcoin and

21   evade detection and that Mr. Freeman is -- it's alleged is

22   making all this possible.

23          Now, the government is -- and to be fair to the

24   government, is not alleging -- and it doesn't appear anywhere

25   in the discovery, which I certainly haven't read all of it yet,

1    there's a lot -- that Nobody or any of the other -- Nobody

2    meaning the name, for the record, not nobody -- Nobody or the

3    other defendants acting as straw bankers are necessarily even

4    aware that Mr. Freeman was involved in scams; that they -- they

5    had a contract with Mr. Freeman to simply facilitate the

6    purchase of Bitcoin in exchange for cash since he couldn't do

7    the banking himself.

8              Now, the reason I bring all that up is because --

9    and I -- again, if I'm mischaracterizing anything, I'm sure

10   Mr. Aframe will jump in; I'm trying to fairly characterize a

11   complicated case in a short period of time here -- is when

12   you're talking about the strength of the case as a factor,

13   the -- I ask the Court to consider that's the alleged role of

14   my client, not that he's this bad actor who knows old people

15   are getting ripped off but that he's a person that thinks that

16   he can lawfully buy and sell Bitcoin without a -- without a

17   money transmitting license or a money services business license

18   and that by doing so he helps Mr. Freeman in facilitating these

19   scams, whether it's wittingly or unwittingly.  There's no

20   evidence it's wittingly.

21             So I think it's important that the Court know that

22   at some strength of their case and exposure of Nobody at

23   sentencing is an important factor probably in the Court's

24   consideration of the risk here.

25             THE COURT:  I really want to make sure -- this is

1    the part of the argument, I'll tell you, Mr. Brown, I'm very

2    interested in, strength of the case.  It's not -- frankly, it's

3    not treated very heavily in the papers.  Mr. Aframe treated it

4    more.

5              And what -- it sounded like what you were trying to

6    tell me just now is not so much that it's a weak case, but just

7    that your client's sort of culpability level, knowledge of

8    certain factors in the case maybe known to Mr. Freeman, is not

9    strong.  That I get.  But I'm not sure, honestly, based on the

10   burden of proof for these two charges, how much that really

11   undermines the strength of the case.

12             Can you talk about that a little bit?  Because

13   that's -- I'm telling you, for the Court now in this -- in this

14   detention release, the strength of the case is a big factor for

15   the Court.

16             MR. BROWN:  Well, we would seek -- without trying to

17   turn this into a motion to dismiss or for summary -- for a

18   directed verdict, Judge, at this point, we would, if we were at

19   trial tomorrow, think the defense would be seeking to prove or

20   cast a reasonable doubt on the issue of whether or not a money

21   transmitting license was required.  The state of New Hampshire

22   does not require it.  It's generally an issue of state law.

23             This issue gets very, very complicated; Ms. Allen is

24   actually our expert on this issue of money transmission and

25   stuff.  I -- I am not.  I'm just an old criminal dog, Judge.

```
 1                    THE COURT:  Yeah.
 2                    MR. BROWN:  But that would be one of our defenses.
 3                    But regarding the issue of the fraud and the actual
 4    damages to these victims, our argument would be that if there
 5    was an intent to engage in a conspiracy to do money
 6    transmitting, there was not an intent to join in a criminal
 7    enterprise to defraud people of money -- innocent people of
 8    money.  The intent was to sell coins to people who wanted to
 9    buy coins who didn't want to use a public --
10                    (Unidentified speakers.)
11                    MR. BROWN:  So I think --
12                    (Unidentified speakers.)
13                    THE COURT REPORTER:  Excuse me.  Attorney Brown --
14                    THE COURT:  Yeah, we got it.  We got it.
15                    THE COURT REPORTER:  No, I didn't hear the last
16    thing that Attorney Brown said, so I wanted to make sure I got
17    it.
18                    Public, and then I didn't hear what you said.
19                    MR. BROWN:  Right.  Someone that didn't want to
20    necessarily use a public exchange or have a public record of
21    the purchase or sale of Bitcoin.
22                    So, you know, in that -- in that regard, it's -- the
23    argument would be the scope of the agreement.
24                    So, you know, we would not want to take on the task
25    of trying to prove that Ian Freeman never knew that a single
```

1    one of these people was being scammed out of their money.

2    That's Mr. Sisti's job and he's a quite able attorney, as I'm

3    sure the Court's aware.

4            But, you know, we -- we can sit here and say we're

5    not saying Mr. Freeman did anything wrong.  But what we're

6    saying is if he did, you know, my client was never in an

7    agreement to do that.  My client wasn't in agreement to

8    process -- if he agreed to anything, and they have a written

9    copy of this -- to let money be deposited in a bank account

10   that he controlled and then to transfer money back to

11   Mr. Freeman.

12           THE COURT:  Mr. Aframe -- Mr. Aframe, is -- is

13   scienter part of your burden of proof on the unlicensed money

14   transaction charge?

15           MR. AFRAME:  Not -- that he knows he's entering into

16   the -- not that he -- not that he knows that he needs a

17   license.  I mean, it was -- under the B prong, either he needs

18   a license or he does not.  There are going to be legal

19   arguments on that count at some point, I am sure, about whether

20   he needs a license or not.  If he does need a license and he is

21   engaging in the -- in the -- in the transmission business, then

22   he's -- my opinion is he's guilty.

23           And I do want to focus, though, on the other count,

24   which is the wire fraud count --

25           THE COURT:  I know, but I --

1           MR. AFRAME:  At my turn.  When it's my turn.

2           But, yes, I think -- no, I think the answer is no.

3    I think there are legal issues that we're going to have to

4    resolve and once we're over that, the knowing doesn't go to the

5    license, if that's your question.

6           THE COURT:  That's my question.  Thanks for

7    answering it.

8           Sorry to interrupt you, Mr. Brown.  Go ahead.

9           MR. BROWN:  No, your Honor.  I mean, it's a fair

10   point, but we are certainly going to be arguing, whether it's

11   at motion or at trial, depending on how the jury instructions

12   shake out in a case like this, whether or not there was a

13   requirement for a license.  And in this particular case, if

14   there's not a requirement for a license, you know, I'm going

15   out on a limb here very early in the case but to say that the

16   entire case against Nobody is on pretty shaky ground at that

17   point because if his intention is to say, well, I'm going to

18   allow you to use my bank account to buy and sell Bitcoin and --

19   because I don't think there's a license required and the

20   government can't prove that one is required, he's not engaging

21   in any crime or any conspiracy at that point because, again, I

22   don't think the government will ever seek to introduce proof

23   that he knew anybody was being scammed out of money if, in

24   fact, Mr. Freeman was doing that.  I'm not conceding he was.

25           And why that's also important is possible exposure.

1    So, you know, when we talk about him being a flight risk or a

2    danger with the nothing-to-lose kind of argument the

3    government's made, he's making a comment, I might as well kill

4    myself with heroin, if we get to a sentencing in this case, you

5    know, there's always a question, especially with fraud counts,

6    as to loss and is that attributable to him.  And so I think the

7    possible exposure is also an issue as well.

8            I did want to move on unless the Court had more

9    questions on that issue to the magistrate's order and some

10   actions that we had to that, which would be document number 76,

11   your Honor.

12           THE COURT:  Yup.

13           MR. BROWN:  Specifically -- well, we've already

14   covered one of them; the Court asked that very important

15   question at the beginning, like what was the reason for it.

16   And in -- we want to point out that the magistrate seemed to

17   have rejected the government's argument that the prior history,

18   strength of the case, all those other factors were enough to

19   detain Nobody; said but for this phone call, which the Court, I

20   believe, has already said, hey -- and, Judge, you almost stole

21   directly a line out of my notes for what I was going to say to

22   you today.  I don't know if you were a former criminal defense

23   attorney at some point, Judge, but --

24           THE COURT:  No.

25           MR. BROWN:  -- certainly had an opportunity to hear

1    calls like that and I think your remark was almost word for

2    word what I had written.  The only thing I was going to add was

3    I've heard far worse.  I've had some of my clients' recorded

4    phone calls played back by U.S. attorneys and state prosecutors

5    where you cringe.  I've heard me mentioned, you know.  So when

6    you have a guy in jail at the bottom of a hole mentally,

7    especially early in a case, it's a pretty typical,

8    blowing-off-steam session and I -- and I think the Court's

9    regarding it as such.

10           So right there we're arguing that the -- that the

11   magistrate erred and it's, of course, a de novo review, in

12   finding that -- and this is interesting, too.  Considering that

13   the burden is clear and convincing evidence, the magistrate

14   says -- and I should refer to him in -- Judge Lynch says to

15   these calls, and I'm jumping in in the middle of the

16   sentence -- does this call merely reflect a person who's

17   frustrated and venting about a charge he thinks is unjust or

18   reflect the mind of a person whose hatred towards the

19   government could move him to a violent action against others if

20   released.

21           There is no definitive answer to that question.  So

22   even at that level, where he only heard excerpts, the

23   magistrate's saying, I don't really know.  And I would argue

24   that's a concession that it's not clear and convincing evidence

25   when it doesn't pass preponderance.  I mean, they're saying it

1    could be one, could be the other.  So those are our objections

2    there.

3            Now, regarding the rest of the order, what's

4    interesting about it is there's three cases discussed in the

5    order and I really wanted to talk about two of them.  And I'll

6    try to keep this brief.

7            There's *United States vs. Ploof*, which is 851 F.2d 7

8    from the First Circuit in '88; the *Patriarca* case, which is 948

9    F.2d 789, of course First Circuit again, 791; and *State vs.*

10   *Perez-Franco* from 1988, same circuit, 839 F.2d.  *Franco* is kind

11   of duplicative of the other two, so I was going to talk about

12   them.

13           What's interesting about them is they're cited in

14   support of detention hearing, but when you go and look at the

15   cases, my credit to Ms. Allen on this who actually went and

16   broke these cases down, they support release in this case

17   rather than detention.

18           In the *Ploof* case, you had a -- you had a pretty

19   disturbing allegation that Mr. Ploof had plotted to first

20   injure and then kill his ex-girlfriend's husband.  So she broke

21   up with him and I guess he wanted to kill her husband,

22   allegedly --

23           THE COURT:  Hold on.

24           Mr. Brown, I've got to interrupt you, only because

25   it sounds like we're going to be talking here for a little

1   while, and I want to hear every argument you want to make and

2   Mr. Aframe.  But we've been going for 90 minutes and the court

3   reporter needs a break.

4            MR. BROWN:  Okay.

5            THE COURT:  Generally that's my practice,

6   90 minutes.  So we're going to take about a 10- to 15-minute

7   break right now and then reconvene.  Okay?

8            MR. BROWN:  Very good.

9            THE COURT:  I apologize for the inconvenience for

10  anybody who's attending, but I've got to think of the court

11  reporter.

12           I do want to thank Ms. Kelly for muting her mic

13  there.  It sounded like her kids were getting into it a little

14  bit and she very quickly took care of that and I appreciate

15  that.

16           Thank you.  And we will reconvene in about 10 or 15.

17  We'll just keep an eye on the screen.

18           MR. BROWN:  Very good, sir.

19         (Recess taken from 12:41 p.m. until 12:55 p.m.)

20           THE COURT:  Mr. Brown, you were -- you were making

21  your argument.  Please continue.

22           MR. BROWN:  Thank you, your Honor.

23           Before I -- I was just starting to discuss the *Ploof*

24  case, which is really important in this particular case.

25           Before I did though, somebody blew right over my

1    head earlier and then during the break I thought about it,

2    talking with Ms. Allen and Mr. Richard.

3            If the argument -- if the case does turn on strength

4    of the case being a major issue, and I appreciate the candor of

5    the Court.  It's nice to have a jurist that tells you what the

6    Court is looking at instead of just leaving you to kind of

7    stumble in the woods.  So I know that's going to be important

8    for us to focus here.

9            One thing that occurred to me is this case is

10   essentially the same discovery, same allegations, against

11   everyone with the exception of Mr. Freeman who has much more

12   serious allegations than the other five and the others are all

13   out.  And I know the Court's aware of that, but I just make

14   that rhetorical point for --

15           THE COURT:  I -- that's -- literally that's where my

16   mind is.  The -- the problem is, and I'll tell you now, since

17   you -- you know, if you appreciate knowing where the Court's

18   mind is, I -- I try to do that all the time in litigation, to

19   some people's great frustration, but I want you to know what

20   I'm thinking.

21           What the other -- what the other defendants don't

22   have is his record.  Okay?  I'm not saying it's the worst

23   record I've ever seen because it's not, but it's got some

24   issues.  And when you combine it with the strength of the case,

25   it's problematic for me.

1    That said, know I have an open mind on this and I

2    just want you to know what I'm thinking.

3    MR. BROWN:  Well, once again, you beat me to the

4    punch on that one.  And it was pointed out to me by cocounsel

5    that is the difference between them.

6    THE COURT:  Yeah.

7    MR. BROWN:  If it's the same case for everybody, he

8    does have that record.  It is nonviolent drug offenses and a

9    community misdemeanor having to do with community

10   demonstration.  Like the Court said, it's not the worst ever,

11   but it is a way to distinguish him from the other folks.  I

12   would argue Mr. Freeman's much more serious charges may

13   outweigh the difference in the facts of record.

14   But I will move along to really the second argument

15   that -- that the defense has here is even if it seems that the

16   standard for pretrial detention was met based on the

17   combination, as the Court has said, of prior record and the

18   strength of the government's case, there's -- with respect to

19   the magistrate court, there's a misapplication of the pretrial

20   detention statute here.

21   The government argued under Section 3142(f)(2)(B),

22   which is that, to wit, a serious risk that such person will

23   obstruct or attempt to obstruct justice or threaten, injure, or

24   intimidate or attempt to threaten, injure, or intimidate a

25   prospective witness or juror.  And the magistrate judge found

1    based on that there was clear and convincing evidence to

2    detain.

3              So *Ploof* talks about this very circumstance and as I

4    was starting to say before our recess, the *Ploof* case involves

5    a guy who was -- you know, supposedly wants to kill his -- I

6    don't know what the outcome was, I don't know if he was

7    convicted, but he was supposedly trying to kill his

8    ex-girlfriend's husband.  The magistrate in that case held

9    there was no condition or combination of conditions that would

10   reasonably assure the safety of other persons in the community

11   if he were released.

12             He moved to revoke the detention where the district

13   court in that case after conducting de novo review concluded

14   also the government had proven by clear and convincing evidence

15   no condition or set of conditions would ensure the safety.  So

16   the same section we're talking about.  Specifically, they were

17   looking at the girlfriend's husband and the community at large.

18             The Court did not state whether the husband was

19   likely to be a witness in the case, so we don't know if they

20   were going to call him, but that he was a member of the

21   community in danger.  As the magistrate judge here said, the

22   Court has a duty to protect the law enforcement officers in the

23   state of New Hampshire, to paraphrase the previous order.

24             The First Circuit looked at the Bail Reform Act and

25   the First Circuit came to the conclusion in the *Ploof* case

1    that -- and this is a quote from the case:  Where detention is

2    based on dangerousness grounds, which is what we have here, it

3    can be ordered only in cases involving one of the circumstances

4    set forth in 3142(f)(1).  If there is no contention by the

5    government that (f)(1) conditions exist, the detention based

6    solely on dangerousness to another person or the community is

7    not authorized.  So that's the argument of the government here.

8            And so although the magistrate judge found clear and

9    convincing evidence as to (2)(B), f(2)(B), the *Ploof* case says

10   before you can make that finding, you have to go to (f)(1), and

11   there's (A) through (E), and it's an exclusive list.  It has to

12   be a crime of violence, that's (A), we don't have that; (B) an

13   offense where the maximum sentence is life, or death, we don't

14   have that obviously; (C) an offense with a max of 10 but under

15   the Controlled Substances Act, we don't have that; (D) any

16   felony if such person has been convicted of two or more

17   offenses described in paragraphs (A) through (C), there's no

18   allegation he has that type of criminal history; (E) any felony

19   that is not otherwise a crime of violence that involves a minor

20   victim.  No allegation of that.

21           So *Ploof* seems to stand for the proposition that the

22   very section the government argues for detention under and

23   which the magistrate found detention was the only way to ensure

24   the safety of the community here requires a finding that one of

25   those five type of charges or type of, rather, criminal

1    histories is in play and they are not.

2           Interestingly, the same court in *Patriarca* three

3    years later, they were dealing with a mafia don and suggestions

4    to the contrary about my client's following and that -- his

5    potential to influence people, probably most people would

6    consider a mafia Don to be a more dangerous individual than

7    Mr. Nobody.

8           And in that case, he was not in the -- in the

9    particular case he wasn't charged with any personal acts of

10   violence; he didn't fit under that section.  There were no

11   testimonial witnesses subject to threats.  He had strong ties

12   to the community, which Mr. Nobody has demonstrated, was in

13   poor health, that's not a factor here.

14          And the Court there said:  In theory -- this is a

15   quote -- a mafia boss was an intimidating and highly dangerous

16   character.  The government had not demonstrated that this boss

17   posed a significant danger or at least not a danger that could

18   not be overcome, given appropriate conditions.

19          So it -- the Court went on, the circuit court went

20   on to devise a creative adequacy of conditions for release.

21   Essentially it amounted to house arrest for Mr. Patriarca,

22   which we don't believe is warranted in this case, but found

23   that, you know, for the same reasons that it had found three

24   years earlier in the *Ploof* case that the conditions did not

25   exist to allow for pretrial detention because you're not

1    meeting one of those five categories.

2              So, you know, we have sort of a dual argument here.

3    The Court has already said the phone call is of not much

4    importance, so I'll stop talking about that, but we have the

5    argument that, you know, he -- his charges are similar to four

6    other defendants, and much less than Mr. Freeman's, and yet

7    they're all out, the only difference being a criminal record

8    which is nonviolent drug offenses.

9              THE COURT:  How many -- what do you mean by his

10   charges are less?  What's that mean?

11             MR. BROWN:  I believe Mr. Freeman has additional

12   counts in the information that he's charged with --

13             THE COURT:  Okay.

14             MR. BROWN:  -- that Mr. Nobody is not.  I don't

15   have -- the information, pardon me, the indictment.  I do not

16   have Freeman's indictment in front of me.  I apologize.

17             THE DEFENDANT:  It's operating a continuing criminal

18   enterprise, a charge that carries ten to life.

19             THE COURT:  Yeah, CCE charge.  Thank you, sir.

20             MR. BROWN:  As you can see, my client knows the

21   documents of the case better than I do, Judge.  I apologize for

22   that.

23             THE COURT:  You have --

24             MR. BROWN:  So those are dual arguments.  The

25   argument would be even if it -- even if the government were

1    allowed to move for detention with a nonviolent charge like

2    this, which *Ploof* seems to say it can't, that it wouldn't be

3    appropriate given that everyone else is out on release and the

4    only difference is some nonviolent drug offenses.  We've

5    established very strong ties to the community, no failures to

6    appear in court, a willingness and ability which the Court

7    can -- the Court is the judge of my client's credibility, but I

8    believe he was credible in testifying, his willingness and

9    ability to follow conditions that the Court sets on his

10   release, of which there should be several.

11          If the Court were to grant this, we concede there

12   should be several.  The Court has set many conditions on the

13   other defendants.  We would suggest the same conditions be set:

14   That he be instructed to live -- provide the address of Tamsin

15   Thorn to pretrial services; that he be instructed to live there

16   and not change residence without their permission and without

17   consulting with them; not to leave the state or the district,

18   of course; to either be employed or be seeking employment or be

19   in an education program and provide proof.

20          Clearly he should not trade in, purchase, buy, sell,

21   or program for a company trading in cryptocurrency while --

22   while -- until the case is resolved; no contact with any

23   witnesses in the case, including law enforcement officers,

24   obviously; and no possession of firearms or other dangerous

25   weapons.

1          We're open to other conditions as well that the

2    government may suggest or the Court may deem proper.  As he

3    said, he would follow any conditions and he would give his word

4    to do so.

5          The only thing we would ask if the Court is going to

6    consider allowing for release -- for release here is that he be

7    allowed, consistent with Mr. Freeman's order and Ms. DiMezzo's

8    order, that he be allowed to have contact with them solely for

9    the purpose of the operating of the radio station Free Talk

10   Live.  He works with them when he's not in jail, but he works

11   with them on those programs.  And just consistent with the

12   orders that have been entered for those two defendants.

13         Thank you for hearing me out.  It was quite lengthy.

14   I appreciate your patience, your Honor, and I turn it over to

15   the government.

16         THE COURT:  Understood.

17         Mr. Aframe, are you -- I'm looking at Judge Lynch's

18   order which says that you invoked 3142f(2)(B).  Are you only

19   under threats, injury, intimidation, obstruction, and all that

20   and not flight risk?

21         MR. AFRAME:  As in (2)(A)?  You know, I would have

22   to go back and look at the pleadings, but I think at least

23   our -- I think that what we presented evidence on was (2)(B)

24   based on the phone calls, I believe.

25         THE COURT:  Yeah.  Yeah, I mean, I obviously

1 understood you presented evidence under (2)(B) to satisfy your

2 burden or the phone call evidence to satisfy a burden under

3 (2)(B); I just didn't know you had only proceeded under that --

4 under that subdivision of the act.  I don't know one way or the

5 other, because I'm going from Judge Lynch's order not from the

6 transcript or anything else.  I just don't know.

7 　　　　　　　MR. AFRAME:  Yeah.  And John Kennedy handled that

8 hearing, but --

9 　　　　　　　THE COURT:  Yup.

10 　　　　　　　MR. AFRAME:  -- that was -- that was at least

11 the thrust -- I'm sure that was the thrust of what we said.

12 Whether we also said -- maybe Mr. Brown recalls whether we said

13 anything about risk of flight.  I don't -- I don't recall.

14 　　　　　　　THE COURT:  Okay.  All right.  Go ahead.

15 　　　　　　　MR. AFRAME:  Well, your Honor, you know, the -- the

16 question to me is whether there's a -- whether he poses a

17 danger to the community, primarily, and I tried to -- you know,

18 there is the -- there's obviously the criminal record.

19 　　　　　　　The evidence against him -- so let me just agree

20 with Mr. Brown, first of all.  I don't want to overstate.

21 That's never my -- my way of handling cases.

22 　　　　　　　So Mr. Freeman is the focal point of this case.

23 There's no way to state it any other way.  As you will

24 understand this case as it -- as the acts come before you, I

25 think that it will be presented that Mr. -- Mr. Nobody and the

1    other defendants were working with and helping out Mr. Freeman

2    with various levels of detailed knowledge about what he was

3    doing and that's -- that's reflected in the difference in the

4    charges.  So I don't want to -- I don't want to overstate that

5    in any way.

6            The essence of the crime against Mr. -- against

7    Mr. Nobody is that he helped Mr. Freeman run a money

8    transmitting business that should have been licensed, that's

9    number one; and the way he did that, number two, is he

10   misrepresented to the banks what the nature of the business was

11   going to be in that account.  And by doing that, he committed

12   wire fraud.

13           And it's -- there is a document that basically sets

14   forth, that's between Mr. Freeman and Mr. Nobody that that's

15   what they're going to do.  Mr. Nobody's going to open the

16   account in the name of his church; Mr. Freeman will have

17   control; Mr. Nobody will do certain things in managing the

18   account to help Mr. Freeman, but Mr. Freeman will be basically

19   pulling the strings.  And so that, to me, is very clear

20   evidence of misrepresentation to the bank, which is the

21   gravamen of the wire fraud charge.

22           Mr. Brown has already explained that there'll be

23   some legal argumentation about the money servicing business

24   charge.  It's -- we can't really get into all that today.

25   Suffice to say my view is every case that has decided that

1    question has already decided it in the way the government will

2    present it, but, you know, we're just not really prepared

3    today, either side, I don't think, to get into the legal, you

4    know, nuances of those arguments.

5            So strength of the evidence on the wire fraud and

6    the money servicing business charge, especially the wire fraud

7    charge, I think are strong.  He has a criminal record filled

8    with multiple offenses, drug offenses.  Drugs were found in

9    his -- in his house.  A significant quantity of pure

10   methamphetamine was found, from what I believe, in a safe in

11   his house; the safe, by the way, I think that he's referring to

12   in the call when -- or at least the friend is referring to in

13   the call when they talk about, you know, did they find

14   whatever's in the safe.

15           So beyond that, I do think that Judge Lynch's

16   concern, which remains my concern, is the call in the sense of

17   what I was trying to elicit through my --

18               THE COURT:  Yeah.

19               MR. AFRAME:  -- cross-examination.  I don't know if

20   this is a violent man.  I'll be honest with you.  I find him

21   very engaging when we have these hearings.  He's a smart man.

22   He's an interesting man.  But he's also a volatile man with

23   lots of supporters who when he's volatile clearly says things

24   that are provocative in a way that's dangerous to the community

25   and that's the concern.

1          You know, the -- a lot of things are going to happen

2    in this case.  Maybe they'll break Mr. Nobody's way, maybe they

3    won't.  If they don't, there's a risk here that -- and it's not

4    a risk I'm making up.  We heard him.  And I know he's very

5    intelligent and he's presented all sorts of counter arguments

6    and refinements and I appreciate all of that, but in the

7    moment, he was telling a guy, we need to start shooting police

8    because this case is really unfair.

9          And he may -- maybe today he feels good about the

10   case, but in January or whenever he might not.  And if he's

11   out in the community with a large group of people who are

12   supporting him and he makes comments like that, we don't know

13   what will happen.  And that -- that's a risk.  And it's not a

14   risk -- I mean, it is a risk caused by those other people, but

15   it's a risk caused by his, you know, willingness or penchant to

16   engage in this kind of rhetoric when he doesn't think things

17   are going his way.  And I think that's a legitimate thing to be

18   concerned about.

19         You know, I appreciate all the free speech

20   arguments, I'm quite familiar with them, and I don't think

21   anybody should be punished in any way for their beliefs.  But

22   when their beliefs attach to what we're -- it's more than

23   beliefs.  When their actions attach to what we're concerned

24   about under the law, that's different.  And that's -- and

25   that's, I think, the concern that Judge Lynch was getting to.

1    He may be blowing off steam.  He may not have meant it.  He may
2    just be a guy who likes to hear the sound of his own voice
3    saying that stuff and that's -- you know, maybe, maybe he's not
4    the one that will pick up the weapons.  But there's just too
5    much unknown here.  But what we do know is he says, like, let's
6    go shoot the pigs; let's get the -- you know, the boogaloo
7    should start; my lawyer should die.  Those are all things to be
8    concerned about.
9            So I think that was the thrust of what Judge Lynch
10   was saying.  I tend to agree with that.
11           THE COURT:  Sure.  Clearly.  I don't know if that's
12   what Judge Lynch was saying, but that's how I understood your
13   cross and that's -- to the extent that I'm concerned about the
14   calls, and it's not a huge amount, to be honest, but to the
15   extent I'm concerned about the calls it's that issue.  It's
16   his -- his encouragement and leadership and how it would be --
17   how his words would be interpreted by others.
18           I don't view -- I don't view Mr. Nobody as someone
19   who's going to, at least in the near future, take up arms or
20   harm his lawyer or harm anybody else.  I just don't see that.
21   But he's articulate and charismatic and he's got a pretty good
22   grasp of the First Amendment, I think, and, you know -- I do
23   have concerns, though.
24           Okay.  It's your motion.  I'll give you the last
25   word on this, Mr. Brown.

1          MR. BROWN:  Very good.  Thank you, your Honor.

2          And I don't think Mr. Aframe overstates his case or

3  throws bombs.  He's a true gentleman.  It's been a pleasure to

4  work with him.  It's been a pleasure to do this hearing today.

5          Regarding the money -- the legal issues to be

6  debated regarding money transmitter, I do agree with him on the

7  issue of Bitcoin or cryptocurrency requiring a money

8  transmission license.  There isn't case law at the circuit

9  level in the First Circuit, but I do agree with Mr. Aframe it

10  seems the decisions nationwide keep falling the government's

11  way there.  So we have an uphill climb there.

12          But there is a secondary issue is when are you

13  required to get a money services business license.  So at a

14  state level you can become a money service business and each

15  state has their own rules for that.  New Hampshire -- so there

16  may be a question of whether New Hampshire does or does not

17  require that for Bitcoin.

18          And then there's the federal level and, of course,

19  we're in federal court, which is governed by FinCEN.  And

20  FinCEN says, and this is important and, quite frankly, I don't

21  have enough of a grasp of the discovery, I'll be honest with

22  you, Judge, to know if there may be a big issue here.

23          But FinCEN gives you a 180-day grace period in which

24  to get the licensing and the compliance stuff set up, you know,

25  after you begin acting under what they consider to be a money

1    service business by doing money transmission.  They're -- the

2    two terms are almost synonymous, money transmitter or money

3    service business.  So there may be an issue on the timing of

4    that.  I don't want to overstate -- as Mr. Aframe just said, I

5    don't want to overstate on our end that there is an issue with

6    the 180 days, but we're looking into that, whether there is.

7              And regarding, again, the danger, we believe that

8    the *Ploof* case and the *Patriarca* case address that squarely in

9    that that issue alone cannot be the issue to hold someone under

10   these circumstances.

11             THE COURT:  What do you mean, strength of case?

12             MR. BROWN:  That -- the strength of the case

13   alone -- yeah, strength of the case with prior record when

14   you're making an argument there has to be a basis for a

15   pretrial detention, as the Court is well aware.  And I believe

16   and I don't -- I'm with Mr. Aframe; I don't remember if

17   Mr. Kennedy raised flight risk.  I don't think so, or it may

18   have been mentioned just in passing, but it's always been the

19   crux of the argument that the guy is dangerous.

20             And these cases stand for that -- if that's the

21   basis for your request, you've got to fit into the five

22   categories under (f)(1) and it does -- we're not in there.  So

23   I don't think that there -- that that's the issue, too.

24             So even if the Court says, well, I think it's a

25   strong case and I also think his prior record coupled with that

1  gives me concern, I do understand, but that's what --

2          THE COURT:  So what -- time out.  Time out.

3          You're telling me that *Ploof* and *Patriarca* stand for

4  the proposition that if you're going to detain someone under

5  f(2)(B) for --

6          MR. BROWN:  Yes.

7          THE COURT:  -- obstruction, threats, injury,

8  intimidation, then -- then it has to be a case where you're --

9  but, see, (f)(2) and (f)(1) are two different provisions under

10 which you seek -- under which one would seek detention.  I

11 don't know why you would have to satisfy -- you'd have to be

12 one of the cases listed at (f)(1) to -- to satisfy f(2)(B).  I

13 just don't -- it's not that -- I mean, nobody's briefed this,

14 so it's not a -- unless -- unless I overlooked it.  Because

15 this is a very different decision.

16          Let me take a look at the statute here.

17          I don't understand that -- and if *Ploof* -- hold on a

18 minute.  Let me look at this.

19          All right.  I'm taking a look at *Ploof* right now and

20 you might be right, Mr. Brown.

21          Interesting.

22          MR. AFRAME:  Can I -- well, can I just say

23 something?

24          THE COURT:  You know you can.  You know you can.  Go

25 ahead.

1    MR. AFRAME:  So, I mean, looking at -- I mean, I

2    think what we're trying to say is, at least my argument was,

3    the connection of the -- of the statements aren't that they

4    exist in the air, it's that they connect to the violence in

5    this case directed against the FBI.  And that's really the

6    point, right?  It's all directed at the witnesses and the

7    agents in this case.  That's what he was talking.  We're

8    talking -- I'm talking about the -- the supporters and what

9    they might do based on his rhetoric, and that is all about

10   obstructing this case, at least that was my argument.

11             THE COURT:  Yeah.

12             MR. AFRAME:  Because it all does tie to this case.

13   It's not just, oh, he says stuff about other topics.

14             MR. BROWN:  Your Honor, can I -- can I respond to

15   that, sir?

16             THE COURT:  Look, we're in a legal territory here

17   that is not familiar.

18             MR. BROWN:  Well, let me pull back from *Ploof* and

19   *Patriarca*, and I know the Court will take a look at those

20   later, and talk about what Mr. Aframe's talking about.

21             THE COURT:  Well, the real issue is you might be

22   taking a look at them later and filing a brief.  That's the

23   real issue.  I tend to rely on counsel's arguments.  But before

24   you short-circuit what I'm talking about, I want to try to

25   figure it out.

1    I mean, see, I -- I understand that -- and I'm

2    reading a passage from *Ploof* right now and it does seem to say,

3    Mr. Brown, it really does, what you -- exactly what you say.

4    It seems to say that if we're arguing about a risk of

5    obstruction of justice, threats, injury, or intimidation, the

6    case has to be an (f)(1) case as well.  Okay?

7    Now, so your argument on that you just articulated,

8    Mr. Aframe, I don't see how it solves that problem.  It's --

9    your case is not an (f)(1) case, (A) through (E).  It just

10   isn't.

11   Now, I never understood f(2)(B) detention for risk

12   of threat to the community to be somehow confined to (f)(1)(A)

13   through (E) cases.  This just doesn't come up.  It's coming up

14   now.  Okay?  But I have questions.

15   My first question is the fact that Judge Lynch

16   focused on, okay, focused on f(2)(B), risk of -- risk of danger

17   to the community, doesn't mean that the government didn't move

18   under also under f(2)(A).  Because, frankly, I don't see Mr.

19   Nobody -- I keep grasping for your -- you know, your

20   traditional last name and forgetting, sir.  And I don't -- and

21   I mean no disrespect.

22   But I don't see Mr. Nobody as personally threatening

23   despite the venting at the jail, but I do see his -- I do see

24   his community engagement as potentially problematic.

25   That said, the problem with Mr. Nobody, really, is

1   he's been a bad risk on supervision.  He really has been.

2   Okay?

3            Now, look, that doesn't mean he should be detained

4   right now, it doesn't, necessarily.  Especially when trial is,

5   like, in May, which is a long time.  Like the length of this --

6   and that's by agreement; everybody agreed to that.  But I -- I

7   consider that a long time to detain a person pretrial.  All

8   right?

9            Frankly -- so that's why I'm so fixated right now on

10  strength of case.  Because, look, if the case is really strong,

11  which is what -- which is what I've understood, I'll be honest.

12  We talked about this.  You might remember, Mr. Brown, we talked

13  about this at the -- at the sort of -- the complex case

14  conference, when all the lawyers were together, and I was

15  coming at Sisti a little bit about it because I knew Sisti was

16  going to say -- Attorney Sisti, was going to say -- oh, this

17  case stinks, Judge, it's got no grit.  I knew he was going to

18  say that.  And I asked him why and he kind of -- he didn't have

19  a great explanation at that point, but he said what he always

20  says which was we're going to test it and I believe that.

21           But I'm also very accustomed to seeing these federal

22  criminal statutes, all right, and as you pointed out,

23  Mr. Brown, what case law is out there are the unlicensed money

24  transaction statute goes pro prosecution because that's how a

25  lot of these statutes are written.  They're very broad.  And a

1    lot of -- they criminalize a lot of conduct.

2              Now, if it's a strong case and conviction looks --

3    and I don't even prejudge it, and I don't even decide, right,

4    the jury decides.  But it's a strong case and he's a bad risk

5    on supervision, I don't mean to -- I'm going to give you a

6    chance to talk about that, Mr. Nobody, I promise, but I'm just

7    looking at your record.  All right?

8              He's a bad risk and it's a long delay.  You know,

9    there's been times he's failed to appear in court, there's been

10   times he was found in contempt of court.  He's just not a

11   person who -- if this is a legitimate

12   political -- to me it's a legitimate political position.  He's

13   not a person who recognizes the authority of the federal

14   government to be as involved in people's lives as it is.  The

15   problem is -- I think that's a fair characterization of your

16   position, Mr. Nobody, right?

17             THE DEFENDANT:  (Nods head.)

18             THE COURT:  And the problem is I -- I -- I run a

19   small part of that federal government and that's the part of it

20   that is going to impose some restrictions on his liberty

21   leading up to trial.  And I worry about -- when you asked him

22   the question, Mr. Brown, are you going to follow the rules, and

23   his answer was a very thoughtful answer.  This is a very

24   serious person we're talking about.  I don't mean seriously

25   dangerous.  I mean he's a serious man.  All right?  Even though

1  he has a sense of humor, he's a serious person.  And he said,

2  you know, to the extent they're not immoral, I'll follow the

3  rules.  And he was talking about something -- I know, he wasn't

4  talking about -- you know, he was talking about something much

5  more in the line of traditional morality, but he had a lot of

6  serious thoughtful positions on the government.

7           And I -- I -- I don't want him weighing -- I don't

8  want him weighing the rules of deciding whether he's going to

9  follow them, especially when he's got a little bit of this

10  record of -- and I saw you shaking your head, Mr. Nobody, but

11  you have this record of failure to appear and contempt of court

12  and all that and it's not -- doesn't give me hope.

13          You're saying no.  Let me --

14          THE DEFENDANT:  I don't believe I've ever failed to

15  appear, certainly not since I was a teenager.  There may be a

16  failure to appear in Michigan in the '80s.

17          THE COURT:  I could be wrong.  Let me take a check.

18  And I'll tell you right now, if it was that long ago, it won't

19  bother me nearly as much.

20          THE DEFENDANT:  Okay.

21          THE COURT:  Let me take a quick peek at this.  I

22  just need a second.  There it is.

23          All right.  It was -- you know, it was when you were

24  in New Hampshire, Cheshire County Superior Court, Mr. Nobody.

25  There was a little -- it looked like a small drug case -- well,

1    it was possession/sale of drugs, so I don't know what happened

2    with it.  Eventually, yeah, you were convicted after a jury

3    trial in 2013.

4            But it says arraignment --  oh, it's failed to

5    appear for your arraignment.  There could be a number of

6    reasons for that.  It wasn't like -- I guess it wasn't a

7    situation where -- I don't know.  Your record has a failure to

8    appear.  You're telling me that didn't happen?

9            THE DEFENDANT:  I do not believe there has ever been

10   a failure to appear.  It's possible that an arraignment was

11   scheduled without ever notifying me that there was an

12   arraignment and I was arrested later and brought to

13   arraignment.  So that's possible, but any indictment that I

14   have been aware of I have appeared religiously and fought

15   vigorously.

16           THE COURT:  All right.  That's fair enough.  And

17   I -- because I know how district court works, I pretty much

18   take you at your word there.  That kind of thing does happen.

19           But there's a lot of probation violations and the

20   like.  It's just a little bit problematic.

21           So here -- I guess here's what I want to know.

22           I guess I can find out this part.  I can find out

23   this part.  I'm going to take a look at the transcript from

24   the hearing before Judge Lynch.  If the government didn't move

25   on -- on flight risk or risk of failure to appear, I'm probably

1  not going to focus on it unless there's a law that says I

2  should anyway.  And I doubt there is.

3           I guess I want to get a sense of -- hold on a

4  minute.

5           The other legal issue I think -- and, look.  If I

6  want legal -- if I want any kind of legal work on this, I'm

7  going to issue an order that tells you what to do.  I'm not

8  just going to muse here out loud and confuse you.  But I want

9  to look at Judge Lynch's order again.

10          I'm very glad I had the hearing because, as you know

11 from my earlier order, I was not prepared to -- I was not

12 prepared to deviate from Judge Lynch's order before.  Just give

13 me a moment.

14          There we go.  Okay.  Okay.  Give me a moment.

15          Okay.  Here's what it comes down to, right?  Here's

16 what I'm having a little bit of a struggle.  Under 3142(f), and

17 we've been having this -- we've been having this little debate

18 about -- or discussion I should say -- about whether (f)(1)(A)

19 or (f)(2)(A) and (B) -- I think -- about whether (f)(1) or

20 (f)(2) are interrelated in the way that *Ploof* suggests, as

21 you're describing it, Mr. Brown.

22          But the statute, the intro -- the intro to

23 subdivision (f) is:  The judicial officer shall hold a hearing

24 to determine whether any condition or combination of conditions

25 set forth under subsection (c), that's just the conditions,

1    right, of this section will reasonably assure the appearance of

2    such person as required and the safety of the community.

3             Right?

4             And that's what it is.  It's just -- it's not so

5    much that I think he's going to fly to Canada.  I don't.  I

6    don't.  At least I don't know.  That's not really what I'm

7    focused on.  Or -- or personally be out there creating a public

8    health and safety -- public -- public safety threat.  It's more

9    that, look, if he's out, there's going to be conditions.

10   Right?  And --

11            MR. BROWN:  Yup.

12            THE COURT:  -- there's a track record that's not

13   great and that's, I think, putting it charitably, and there's

14   this drug use problem.

15            Look, I'm not generally in the habit of detaining

16   people over marijuana use.  That's not really my practice.

17   Although I'm not in the detention business very much, only when

18   somebody appeals.

19            But, you know, there was meth recovered; he admitted

20   during his interview he uses meth sometimes as a substitute.

21   So I don't think he's a meth addict or anything like that.  I

22   don't -- he doesn't appear to be.  And -- but meth is not a

23   joke, and it sounds like he keeps it sort of a substitute

24   sometimes for when he can't get his lawful prescription.  But

25   it's --

1              THE DEFENDANT:  Uh-huh.

2              THE COURT:  But -- and here's what happens.  When

3    people are on supervision and they've got -- and they're drug

4    users, they get violated and they're back in front of me.  And

5    the parole officer said the same thing; if he can't abide by

6    it, he can't abide by it.  I don't want to be in this vicious

7    circle.  So --

8              THE DEFENDANT:  If I may suggest, I would agree

9    to -- to, as a condition of my release, getting a legal

10   Adderall prescription to treat my ADD and then I have no need

11   to self-medicate.

12             THE COURT:  I get it.  I get it.

13             Okay.  I interrupted you, Mr. Brown.  You were

14   trying to make a point.

15             MR. BROWN:  No, sir, not at all.

16             THE COURT:  Yeah.  Okay.

17             MR. BROWN:  No, I think -- again, I think it's an

18   efficient process.  I'm not trying to flatter the Court.  I

19   just -- I truly believe that, that the Court lets us know where

20   the Court is focused here so that we can focus our arguments in

21   such a manner.

22             Going back to something the Court was asking about

23   earlier, and Mr. Richard sent me an email -- thank you,

24   Mr. Richard -- while we were talking.  The document was right

25   in front of me, but Document 93 which is the government's

1    objection, in paragraph 2, they do confirm that in their

2    initial motion for detention, number 71, that the government

3    move for detention under f(2)(B).  So it makes no reference to

4    moving under (f)(2)(A), which is -- and I -- and not that the

5    Court needs reminding, but I'll reiterate.  It says a serious

6    risk that such person will flee.

7              The Court's concerns from a commonsense standpoint

8    are obvious with the prior history that there may be an issue

9    with him violating pretrial detention -- I mean pretrial

10   release.  Pretrial detention is what we're trying to get out

11   today.

12             But I don't think that's what (A) talks about.  It's

13   the flight risk.  Obviously if he goes and violates the

14   conditions the Court sets, which may also be random screens or

15   regular screens as the Court deems that necessary to protect

16   the community, then we fall under violation of pretrial

17   release, then he's looking at pretrial detention if proven

18   under a whole different statute.  So --

19             THE COURT:  Yup.

20             MR. BROWN:  So we're asking the Court -- well, I

21   guess I'll put it in an old-fashioned process, to give him the

22   chance.  I mean, he's got the rope to hang himself.  As the

23   Court said, he doesn't have the means and he's not the type of

24   guy who's going to take off for Europe or Canada and never come

25   back.  The question is whether he's going to go out and do a

1    bunch of dumb stuff like meth and the Court has to waste more

2    time on the issue instead of moving forward on the merits of

3    the case.

4                And I'm asking the Court to give him the

5    opportunity.  Give him that rope.  If he wants to go out and

6    violate the orders the Court sets down, then he's going to be

7    back in there and he'll have only himself to blame, as we often

8    say.

9                THE COURT:  Yup.  I get it.

10               Anything else you want to say, Mr. Aframe.

11               MR. AFRAME:  No.  I mean, I don't -- you know, I

12   could -- I've now read *Ploof* and I could get into that, but I

13   think that's better done in writing if you want.  So I'm not --

14               THE COURT:  Okay.  Yeah.  I mean, reading the

15   statute -- I don't know.  That -- reading the statute --

16               MR. AFRAME:  Well --

17               THE COURT:  It's a -- reading the statute, I -- I

18   don't understand how -- how subsection 2 would somehow

19   incorporate subsection 1.  I don't get that.

20               MR. AFRAME:  What has to happen -- I'll just try to

21   summarize my understanding really quickly, but not go into

22   great detail.

23               What has to happen is the Court has to make a

24   finding that (2)(B) is met, that we've actually demonstrated

25   that he presents a risk of obstruction of justice and

1    intimidating witness.  We can't just say it.  You have to --

2    you have to actually make a finding.  In *Ploof* they didn't make

3    that finding, or at least clearly didn't make that finding.  So

4    there was no (f) category under which it was clear that a

5    detention hearing was being held.  So I don't know if Judge

6    Lynch did that or not.  I'd have to go back and read how he --

7              THE COURT:  Okay.

8              MR. AFRAME:  But I agree with -- by the way, I agree

9    with Attorney Brown because I was texting with Attorney Kennedy

10   on the side, just to confirm.  (2)(B) was our basis.

11             THE COURT:  Fair enough.  That's -- I appreciate the

12   candor.

13             All right.  Look.  Here's what we're doing.

14             You know, I issued that order saying I wasn't going

15   to overturn Judge Lynch's order providing for a hearing.

16   Whoever's idea it was -- frankly, I thought Mr. Nobody might

17   just want a hearing because he wanted to be heard.  And that's

18   probably part of it.  But whoever insisted on the hearing, good

19   idea, because I'm definitely thinking about this now.

20             So I'm going to take it under advisement here and

21   I'm going to issue a brief order asking counsel to address a

22   couple of legal issues in a short time frame, because I

23   don't -- you know, I don't want to detain anybody longer than

24   necessary.  Okay?  And it's -- especially with this trial so

25   far away, you know.

1          So, look, I'm not guaranteeing anybody I'm going to

2   grant this motion.  What I'm guaranteeing you is I'm taking it

3   very seriously.  And I do.  And I'm going to look at it and

4   issue an order shortly after.

5          This sticky legal issue that Mr. Brown's brought up

6   here, I need to resolve that.  One issue's been taken off the

7   table.  Mr. Aframe, he took (f)(1) off the table.  And if

8   there's anything else I want you to touch on, I'll put it in

9   the order.  Because I think there was another issue.

10          Let me say a few things, though, that might -- let

11   me say a few things that might help you if you're going to make

12   any more arguments.

13          Look, I don't -- look.  To the Court, this is not a

14   Bitcoin case; this is not some type of -- and I don't know what

15   the political motivations are in the -- in Congress's

16   legislation on criminal law generally.  I don't view this as a

17   Bitcoin case.  I don't know where the enforcement priorities

18   lie with DOJ with any of these.  I just look at the indictment

19   and the evidence and this is a wire fraud case and it has an

20   element of this unlicensed transaction, which you're all

21   telling me the law cuts in favor of the prosecution at this

22   point.  Could change once some circuit courts get a look at it,

23   but at this point it's not -- it's a wire fraud case to me

24   mostly.  It's not about Bitcoin.

25          I'm not particularly -- I'm not focused on the phone

1    call with respect to Mr. Nobody's own conduct.  I do have some

2    concerns, though.  Like even the things I saw in the chat,

3    okay, suggest to me that there are people interested in

4    Mr. Nobody who don't have a great understanding of what we do

5    in court.  And I don't mean any disrespect by that.  Who does,

6    really, who doesn't participate in this process?  But I worry

7    about people -- people being -- getting the wrong impression

8    about the goings-on about what -- about what we're doing here

9    and getting the wrong impression by what Mr. Nobody says

10   because he's -- he's a charismatic, quite intelligent person.

11           I do want to give you a heads-up on something.  I --

12   I don't know if -- if I release him, okay, under conditions, I

13   don't know if I'm going to be on board for the radio show.

14   Okay.  For that reason.  Just understand that.  All right?  And

15   that concerns me because I think that's part of how you make

16   your living.  Right?  And I don't want to deprive you of your

17   living, but I don't even know how that works monetarily, the

18   radio show.  But I -- I may have a problem with that and

19   that -- that might be part of the order.  Okay?  So that's on

20   my mind.

21           I -- but to the extent -- it sounds to me like

22   Mr. Nobody has some political views that aren't illegitimate to

23   the Court and I don't know if they translate necessarily into

24   danger.  All right?  I -- I -- a lot of it sounded very much

25   like what I routinely hear on prison phone calls when people

1    are angry about the charges, angry about what they perceive as

2    the injustice behind the charges, and angry at their counsel

3    and all that.  That's most of what I heard.  There's a few

4    things that were a little troubling and I don't want -- I don't

5    want that to pose a threat or danger, so I'm going to -- I'm

6    probably going to address that if I release him through

7    conditions is what I'm saying.  All right?

8                   That's it.  We're under advisement.  I'll get an

9    order out for you to brief it.  Doesn't have to be lengthy.

10   I'll try to put some reasonable limits on it.

11                  But this -- this *Ploof* case -- and I don't know if

12   it would limit me, honestly, and even limit this whole

13   endeavor, because what you're basically saying, Mr. Brown, is

14   this -- this would be a -- an unlawful detention order, right,

15   if I interpret *Ploof* as you do.  And I don't yet, but I'm going

16   to look at it.

17                  All right.  Look for an order from the Court

18   shortly.  I appreciate everybody's participation.  Your

19   presentations were candid and thoughtful and excellent.

20                  And we're under advisement.  We will either

21   reconvene or I'll get an order out one way or the other.

22                  MR. RICHARD:  Thank you.

23                  THE COURT:  We're adjourned.

24                  (Proceedings concluded at 1:41 p.m.)

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 1/18/22          */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR